GUARDIANSHIP OF RICHARD ROE, THIRD.

Franklin. October 9, 1980. — April 23, 1981.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Practice, Civil*, Burden of proof, Appointment of guardian. *Guardian*, Incompetent person, Consent to medical treatment. *Incompetent Person*, Consent to medical treatment. *Mental Health*.

A guardian may be appointed pursuant to G. L. c. 201, § 6, upon proof by a preponderance of the evidence that an individual is unable to care for himself by reason of mental illness, and a temporary guardian may be appointed pursuant to § 14 upon proof by a preponderance of the evidence that the welfare of a mentally ill person requires the immediate appointment of a temporary guardian. [415-426]

In a proceeding for the appointment of a temporary guardian pursuant to G. L. c. 201, § 14, there was sufficient evidence to warrant the judge's findings that the ward was mentally ill, that his judgment was seriously impaired, that he could not make informed decisions with reference to his personal conduct or his financial affairs, and that, upon his imminent release from a mental hospital, it was likely that he would inflict serious injury upon himself or other members of the public, and those findings were sufficient to support the judge's conclusion that the ward was in need of the immediate appointment of a guardian. [426-428]

In a proceeding for the appointment of a guardian pursuant to G. L. c. 201, § 6, there was sufficient evidence to support the judge's findings that the ward was mentally ill, incapable of caring for himself except in the most restrictive environment, incapable of managing his financial affairs except on a very limited basis, and incapable of being gainfully employed in any work except under the direct supervision of his father, and those findings constituted a legally sufficient basis upon which to appoint a permanent guardian. [429-431]

A judge erred in granting a guardian contingent authority to consent to the forcible administration of antipsychotic drugs to his noninstitutionalized ward if certain anticipated events took place since, in the circumstances, the question of the need to consent to the treatment was hypothetical and the substituted judgment decision was, therefore, premature. [432]

A guardian of a mentally ill person does not have inherent authority to consent to the forcible administration of antipsychotic medication to his noninstitutionalized ward in the absence of an emergency, but such medication may be forcibly administered only when ordered by a judge upon a determination of substituted judgment. [433-443]

Discussion of the factors to be taken into account by a judge in making a substituted judgment determination whether to authorize the forcible administration of antipsychotic medication to a noninstitutionalized mentally ill person in the absence of an emergency. [443-448]

Discussion of the State interests capable of overriding a mentally ill person's right to refuse antipsychotic medication. [448-450]

In order to justify on the ground of public safety an order authorizing the forcible administration of antipsychotic medication to a noninstitutionalized incompetent individual, the likelihood of serious harm must be established beyond a reasonable doubt in accordance with the standard for involuntary commitment to a State hospital pursuant to G. L. c. 123 [450-451]; and, where such a showing has been made, the individual is then entitled to choose, by way of substituted judgment, between involuntary commitment to a State hospital and involuntary medication [451-452].

PETITION filed in the Franklin Division of the Probate and Family Court Department on April 1, 1980.

The case was heard by *Keedy*, J.

A motion to transfer the case to the Supreme Judicial Court was allowed by *Liacos*, J.

*Thomas T. Merrigan*, guardian ad litem.

*Richard Cole & Robert Burdick*, for patients at Boston State Hospital, interveners.

*Stephen Schultz*, Administrative and Legal Counsel to the Attorney General, for Commissioner of the Department of Mental Health, intervener.

*Robert D. Fleischner, Marilyn J. Schmidt, Thomas F. O'Hare, Steven J. Schwartz, & Raymond P. Bilodeau*, for Mental Health Legal Advisors Committee & others, amici curiae, submitted a brief.

*Mark I. Berson & James M. Kessler*, for the guardian, submitted a brief.

HENNESSEY, C.J.   The ultimate question we address in this case is whether the guardian of a mentally ill person possesses the inherent authority to consent to the forcible administration of antipsychotic medication to his noninstitutionalized ward in the absence of an emergency.   We conclude that, absent emergency, antipsychotic medication may be administered forcibly to a ward only when ordered by a judge in accordance with the principles articulated herein.   This result is mandated by both constitutional and common law principles.[1]   In reaching this conclusion, we note that our decision has distinct limits.   As we discuss at length in Part III, *infra*, the guidelines we establish herein are applicable in circumstances in which all of the following factors exist:   (1) an incompetent individual is not institutionalized;   (2) a party with standing actually seeks to administer medication to the incompetent person in the absence of an emergency, which we define as an unforeseen combination of circumstances or the resulting state that calls for immediate action; and (3) the proposed medication is an antipsychotic drug[2] — a powerful, mind-altering drug which is accompanied by often severe and sometimes irreversible side effects.   As a preliminary question, we decide that the appropriate standard of proof to be applied in guardianship proceedings is the usual civil "preponderance of the evidence" standard, and that the appointment of both a temporary and a permanent guardian was warranted under the circumstances of this case.   We vacate so much of the order as authorizes the guardian to consent to the forcible administration of antipsychotic medication and affirm the remainder of the order which appoints Richard Roe, Jr., as guardian of his son, Richard Roe, III.

---

[1] See note 9, *infra*, in which we ground this result not only in the constitutional right to privacy, but also in the common law and the inherent powers of the court to control the exercise of authority by guardians.

[2] Two drugs — Haldol (haloperidol) and Prolixin (fluphenazine) — are the challenged medication in this case.   See note 10, *infra*.

On April 1, 1980, after a hearing on the petition of Richard Roe, Jr. (the guardian), and his wife, a judge of the Probate Court found that the guardian's son, Richard Roe, III (the ward), was a mentally ill person whose judgment was seriously impaired and who was in need of the immediate appointment of a guardian. At this hearing the ward was represented by a guardian ad litem. The judge appointed the father temporary guardian of the ward, who, since February 19, 1980, had been committed to Northampton State Hospital for observation and report in connection with complaints against him for attempted unarmed robbery and assault and battery. Since the ward was still institutionalized at the time of the hearing, the judge, relying on *Rogers* v. *Okin*, 478 F. Supp. 1342 (D. Mass. 1979) (*Rogers I*), aff'd in part, rev'd in part, 634 F.2d 650 (1st Cir. 1980) (*Rogers II*), cert. granted, 451 U.S. 906 (1981), decided that the temporary guardian had the inherent authority to consent to forcible administration of antipsychotic drugs for his ward. On April 4, 1980, prior to the implementation of such medical treatment, the guardian ad litem's motion to stay entry of judgment was allowed by the probate judge for ten days as to the administration of antipsychotic drugs. On April 11, 1980, a single justice of this court continued the stay pending further review.

On May 27 and June 19, 1980, evidentiary hearings on the temporary guardian's petition for appointment as permanent guardian were held in the Probate Court before the same judge. The Commissioner of the Department of Mental Health, represented by the Attorney General, was allowed to intervene in both the Probate Court and this court. On July 30, 1980, the probate judge appointed the temporary guardian to be permanent guardian, stating in his order that upon the vacating of the stay issued by the single justice the permanent guardian would have the authority to consent to the forcible administration of antipsychotic medication to the ward.

In his appeal the guardian ad litem raises several issues. He first contends that the evidence was insufficient to permit the probate judge to make the findings which were used to support the appointments of both the temporary and permanent guardians, and that such evidence must be tested by the "beyond a reasonable doubt" standard of proof. He takes the further position that even if the evidence was sufficient to permit these findings, the challenged findings are insufficient as a matter of law to warrant the guardianship appointments. The guardian ad litem finally contends that, even if the evidence was sufficient to support the findings, and the findings are sufficient to warrant the guardianship appointments, it was error for the probate judge to empower the guardian to consent to the forcible administration of antipsychotic drugs for the ward. For reasons we explain below, we hold that both the temporary and permanent guardianship appointments were warranted by the evidence as evaluated under the "preponderance of the evidence" standard of proof, and the findings were legally sufficient, although we agree with the guardian ad litem that to empower the guardian to consent to the challenged medical treatment was error.

## I. THE GUARDIANSHIP PROCEEDINGS.

We summarize the material facts found by the judge following the hearings on appointment of a permanent guardian. We emphasize first that the guardian ad litem frankly conceded at oral argument that the ward is "substantially and severely mentally ill," and this is therefore not directly in issue.

The ward was born on December 28, 1958, and was twenty-one years of age at the time of both guardianship appointments. As a child, the ward had been a bright and popular student, elected twice as vice president of his junior high school class in the public school system. In his freshman year of high school he entered a private, residential preparatory school located near his home. During his first

year at this private school he began to abuse alcohol, marihuana, and LSD, and he became withdrawn and seclusive. The ward's academic performance deteriorated and, as a result of his drinking and other behavior, he was expelled from the private school. He subsequently returned to the public school system, but his performance was so poor that he left the school without graduating.

While at the public school the ward was evaluated pursuant to the "chapter 766" program, and it was recommended that he be hospitalized in a psychiatric hospital. During this time he displayed violent behavior toward his sister and threatened to kill his mother. Subsequently, on August 21, 1979, he was committed to Northampton State Hospital for observation pursuant to G. L. c. 123, § 15 (b), on a charge of receiving stolen property. He was diagnosed as mentally ill, suffering from schizophrenia, chronic undifferentiated type. After his release from Northampton State Hospital he continued to reside at home, where his family tried to protect him from stressful influences. The ward displayed bizarre behavior at home, wearing a fur coat for hours on extremely hot days and standing for prolonged periods of time with a water glass poised at his lips. On numerous occasions the ward's father tried to involve the ward in psychotherapy, but the ward refused to accept any treatment or therapy.

On February 19, 1980, the ward was committed for a second time to Northampton State Hospital for observation, as a result of being charged with attempted unarmed[3] robbery and assault and battery. While so institutionalized, the ward attacked another patient for no apparent reason and had to be restrained by hospital attendants. He was diagnosed as suffering from schizophrenia, paranoid type, and it was recommended that he be treated with antipsychotic medication. The ward refused all drugs, as he had on many previous occasions, and refused as well to engage in psycho-

---

[3] The judge's findings indicate this charge was attempted *armed* robbery, but this is apparently a typographical error.

therapy. This refusal to accept antipsychotic medication
was based on the ward's prior experiences with illicit drugs
which, among other things, caused him to be involved in an
automobile accident. The guardian ad litem strongly con-
tends that another factor in this refusal was the ward's ac-
ceptance of certain tenets of the Christian Science faith, and
there was evidence which might support such a contention,
although the judge concluded otherwise.

While the ward was still hospitalized, his parents filed
petitions seeking appointment of the father as both tem-
porary and permanent guardian. Since the ward's sched-
uled release date from Northampton State Hospital was
April 18, 1980, and the return date for the petition to ap-
point a permanent guardian was April 22, 1980, the ward
would have no guardian during the four-day interim period
if a guardian was not appointed before the ward's release.
Finding, inter alia, that there was a strong likelihood that the
ward would inflict serious injury upon the public or himself
and that there was a need for the immediate appointment of
a temporary guardian, the probate judge on April 1, 1980,
granted the parents' petition seeking the father's appoint-
ment as temporary guardian. The judge stated that until
the hearing on the petition for the appointment of a perma-
nent guardian the temporary guardian would have the
authority to make treatment decisions. It was likely that
during this interim period the ward would be released from
the State hospital and would return to his family, and the
guardian was by implication authorized to make treatment
decisions in both situations. Upon motion by the guardian
ad litem, the judge prohibited the forcible administration of
antipsychotic medication to the ward for ten days, and a
single justice of this court extended the stay to the present
time. The temporary guardian was appointed permanent
guardian on July 30, 1980, with authority to consent to the
challenged medical treatment if we vacated the order pro-
hibiting such treatment. The guardian ad litem appealed,
and a single justice allowed a joint motion to transfer the
case to this court pursuant to G. L. c. 211, § 4A. On Sep-

tember 9, 1980, the single justice allowed a motion to intervene by the named plaintiffs in *Rogers I, supra,* on behalf of the class of patients at Boston State Hospital whom they were certified to represent in *Rogers I, supra.*

We first determine the proper standard of proof by which the evidence adduced in guardianship proceedings must be evaluated. We then consider the appointment of a temporary guardian in the circumstances described above, following which we examine the appointment of a permanent guardian. Since we decide that both appointments were proper, we outline, in Part II, *infra,* the appropriate procedure by which a guardian of a mentally ill person may obtain a court order directing the forcible administration of antipsychotic medication to his ward. We conclude, in Part III, *infra,* with our observations concerning the limits of what we have decided.

## A. The Standard of Proof in Guardianship Proceedings.

We first turn to the threshold issue raised by the guardian ad litem in his contention that the findings supporting the judge's conclusions "are clearly erroneous if not established by credible evidence beyond a reasonable doubt." In support of this contention the guardian ad litem cites *Doe* v. *Doe,* 377 Mass. 272, 280-281 (1979), and *Fazio* v. *Fazio,* 375 Mass. 394, 400-402 (1978). Were we to accept this contention we would establish an exception to the general rule in civil cases that the proof must be by a preponderance of the evidence. 9 J. Wigmore, Evidence § 2498 (3d ed. 1940). We have hesitated to make such exceptions in the past. *Custody of a Minor (No. 1),* 377 Mass. 876, 885 (1979). Such an exception should not be applied "too broadly or casually in noncriminal cases." *Addington* v. *Texas,* 441 U.S. 418, 428 (1979). As we examine the relevant Massachusetts cases the reasons for our previous exceptions to the general rule will become apparent, and it will be seen that these reasons are inapposite here.

We confronted this issue, but did not decide it, in *Fazio* v. *Fazio, supra,* where we stated, "We do not think it neces-

sary to have protracted discussion of the applicable standard of proof in guardianship proceedings which do not necessarily or directly involve or result in a commitment, because, in the particular circumstances of this case, the evidence, viewed in the light most favorable to the plaintiffs, does not warrant the findings mandated by G. L. c. 201, §§ 6 and 14, regardless of which standard of proof is applicable." *Fazio* v. *Fazio, supra* at 401-402. Since this question was not argued in *Doe* v. *Doe, supra,* we expressly stated that we left the question open. *Id.* at 280.

General Laws c. 201, §§ 6 and 14, the statutes concerning the appointment of permanent and temporary guardians, do not address the question. Our cases under G. L. c. 201 and similar statutes, however, establish the principle that proof beyond a reasonable doubt is required when a person (1) receives a stigma at least as great as that flowing from a criminal conviction, and (2) faces a potential loss of liberty. *Andrews, petitioner,* 368 Mass. 468, 489 (1975). Since the ward here does not face a potential loss of liberty, *Doe* v. *Doe,* 377 Mass. 272 (1979), we must decide whether the stigma of being adjudicated unable to care for oneself by reason of mental illness is sufficient alone to require that it be proved beyond a reasonable doubt. For the same reasons that we articulated in *Custody of a Minor (No. 1),* 377 Mass. 876, 884-886 (1979) (determination that individual is an unfit parent is insufficient to entitle the individual to benefit of criminal standard), we think that it is not.

Much of the confusion regarding the appropriate standard of proof to be applied in civil cases involving mental illness was recently resolved in *Addington* v. *Texas,* 441 U.S. 418 (1979). In *Addington,* eight members of the United States Supreme Court held that a State must apply a standard of proof greater than a preponderance of the evidence in civil commitment proceedings in order to meet due process guarantees. *Addington, supra* at 432-433. Individual States, of course, remained free to establish standards of proof higher than this constitutional minimum, as we did in *Superintendent of Worcester State Hosp.* v. *Hagberg,* 374

Mass. 271, 276 (1978), where we required proof beyond a
reasonable doubt in such a case. As we did in *Hagberg,
supra,* we again state that "we doubt the utility of employ-
ing three standards of proof when two seem quite enough."
The "clear and convincing" standard suggested by the Su-
preme Court often serves "as the functional equivalent for
the more familiar 'reasonable doubt' standard." *Custody of
a Minor (No. 1), supra* at 885. We therefore decline to
adopt an intermediate standard.

While we recognize the vast differences between the ap-
pointment of a guardian for a mentally ill ward and the in-
voluntary civil commitment of a mentally ill person, much
of the Court's discussion in *Addington* of the nature and
function of standards of proof is relevant here. The func-
tion of a standard of proof is to "instruct the factfinder con-
cerning the degree of confidence our society thinks he
should have in the correctness of factual conclusions for a
particular type of adjudication." *In re Winship,* 397 U.S.
358, 370 (1970) (Harlan, J., concurring). The standard
allocates the risk of error between the litigants and indicates
the relative importance attached to the ultimate decision.
*Addington* v. *Texas, supra* at 423. In considering what
standard should govern in a guardianship proceeding, we
must assess both the extent of the proposed ward's interest in
not being erroneously subjected to guardianship and the
State's interest in protecting those who might erroneously be
denied the benefits of guardianship under a more stringent
standard of proof.

This court repeatedly has recognized that confinement
for any purpose constitutes a significant deprivation of
liberty that requires society to bear the risk of error, and so
has required the application of the "beyond a reasonable
doubt" standard in such situations. See, e.g., *Andrews,
petitioner,* 368 Mass. 468 (1975) (beyond a reasonable
doubt standard applied to possible commitment as sexually
dangerous person under G. L. c. 123A, § 6); *Superintend-
ent of Worcester State Hosp.* v. *Hagberg,* 374 Mass. 271
(1978) (commitment to mental health facility under G. L.

c. 123, §§ 7, 8, may only be effected upon proof beyond a reasonable doubt). However, in cases involving no possibility of commitment but which might seriously impinge upon personal rights we have refused to apply either the "beyond a reasonable doubt" standard or the "clear and convincing" standard. In *Custody of a Minor (No. 1)*, 377 Mass. 272 (1979), we held that the personal rights involved in a determination of parental incapacity and subsequent termination of child custody rights did not entitle the parent to the protection of either the "clear and convincing" standard or the "beyond a reasonable doubt" standard. We instead retained our traditional "preponderance of the evidence" standard but required "an extra measure of evidentiary protection." *Id.* at 884. We required the judge to enter "specific and detailed findings demonstrating that close attention has been given the evidence and that the necessity of removing the child from his or her parents has been persuasively shown." *Id.* at 886. We resolved that case in this manner because we felt that the adoption of the intermediate standard would add confusion and might serve no useful purpose, and that the adoption of the "beyond a reasonable doubt" standard might jeopardize the welfare of the child. *Id.* at 885. For identical reasons we feel that the "preponderance of the evidence" standard is the appropriate standard to be applied in this case. Similarly, although we decline to set forth any specific formula, we feel that a conscientious judge, being mindful of the adverse social consequences which might follow an adjudication of mental illness, will subject an individual to guardianship only after carefully considering the evidence and entering specific findings indicating those factors that persuade him that a guardian is needed. Cf. *King* v. *King*, 373 Mass. 37 (1977); *Rice* v. *Rice*, 372 Mass. 398 (1977).

If we adopted the criminal standard of proof in guardianship proceedings, the appointment of a guardian would be precluded for all but those whose mental illness and inability to care for themselves could be established beyond a reasonable doubt. This preclusion would doubtless apply to

many individuals whose mental illness could be established by a preponderance of the evidence. It is our concern for this group of individuals — who are more probably than not unable to care for themselves by reason of mental illness, but whose incapacity is not provable beyond a reasonable doubt — which prohibits the adoption of the criminal standard. We do not feel that more harm will befall an individual who is erroneously subjected to guardianship than to an individual who is in need of a guardian but is erroneously denied one. If an individual is erroneously subjected to guardianship, then G. L. c. 201, § 13A, allows such a ward to file a petition for the removal of his guardian.

Moreover, were we to apply the criminal standard to the appointment of guardians, it would be exceedingly difficult to meet the standard even in the most extreme cases. "The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations. The reasonable-doubt standard of criminal law functions in its realm because there the standard is addressed to specific, knowable facts. Psychiatric diagnosis, in contrast, is to a large extent based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician. This process often makes it very difficult for the expert physician to offer definite conclusions about any particular patient." *Addington* v. *Texas*, 441 U.S. 418, 430 (1979).

For all of these reasons, we conclude that a permanent guardian may be appointed pursuant to G. L. c. 201, § 6, upon proof that it is more likely than not that an individual is unable to care for himself by reason of mental illness, and a temporary guardian may be appointed pursuant to G. L. c. 201, § 14, upon proof that it is more likely than not that the welfare of a mentally ill person requires the immediate appointment of a temporary guardian.

B.   THE APPOINTMENT OF A TEMPORARY GUARDIAN IN
     THIS CASE.

The guardian ad litem contends that the appointment of the temporary guardian was improper since the requisite

findings were not made and the evidence was insufficient to warrant those findings which were made. We first consider whether the findings of the judge were warranted by the evidence.

Two witnesses testified at the hearing on the petition for appointment of a temporary guardian. One of them, the medical director at Northampton State Hospital, stated that the ward was determined to be mentally ill in August, 1979, when the ward was first committed to Northampton State Hospital for observation and report following a criminal complaint filed against him for receiving stolen property. At that time he was diagnosed as suffering from schizophrenia, paranoid type. Test results suggested many psychological problems, among them "the intense need to present a good front, judgment deficiency, identity problems, anxiety, insecurity, shallow social relations, handling hostilities by making others miserable, egocentricity, low self-esteem, rigid defenses and little tolerance to their being challenged, little learning from experience, poor insight, stubborn attitude, hypersensitivity" and the possibility of aggressive behavior. The medical director further stated that the ward's judgment was impaired to the point that he was unable to care for himself properly, and that failure to initiate drug therapy promptly would increase the chance that this mental illness would become chronic.

The guardian (the ward's father) testified, among other things, that the ward tended to become violent when communications became difficult, that he had not been "acting right" since age sixteen, that he had assaulted both of his parents and that he had been very heavily involved in drug abuse while attending private school. The guardian ad litem's report informed the judge that, at the time of the hearing, the ward was again committed to Northampton State Hospital as a result of criminal complaints filed against him charging attempted unarmed robbery and assault and battery. Evidence showed that there would be a four-day interval after the ward's release from the hospital but before the return date of the petition for appointment of

a permanent guardian during which the ward would be without benefit of treatment and without the protection of a guardian.

Based on this evidence and on other evidence before the court, the judge made the following findings: that the ward was mentally ill; that his judgment was seriously impaired; that he could not make informed decisions with reference to his personal conduct or his financial affairs; that his judgment was impaired to such an extent that if he were released there would be a strong likelihood that he would inflict serious injury upon himself or upon other members of the public; and that there was a necessity for the immediate appointment of a guardian. The judge concluded that, under *Rogers I, supra*, the guardian would have the inherent authority to make treatment decisions. We think that the evidence more than adequately supported the judge's findings.[4] Furthermore, we feel that the findings, as a matter of law, constituted sufficient support for the appointment of a temporary guardian. General Laws c. 201, § 14, conditions the appointment of a temporary guardian upon a finding that the "welfare" of a proposed ward requires the immediate appointment of a temporary guardian. "The question to be addressed is whether an individual, for whom a guardian is proposed, is so incapable of handling his personal and financial affairs as to warrant the immediate appointment of a temporary guardian." *Fazio* v. *Fazio*, 375 Mass. 394, 404 (1978). We think that the evidence and findings did indeed address this question, and that the facts found by the judge were sufficient to enable him to conclude that the ward was in need of the immediate appointment of a guardian.[5]

---

[4] We do not agree, however, that a guardian possesses the inherent authority to make such treatment decisions for his ward. See Part II, *infra*.

[5] The guardian ad litem claims that "the court predicated its appointment of a temporary guardian on its determination that the four-day interval between the possible release date . . . and the return date of . . . the petition for appointment of a permanent guardian warranted a temporary guardian so as to allow the forced administration of anti-psychotic medication." Por-

## C. The Appointment of a Permanent Guardian in This Case.

The guardian ad litem asks that the appointment of a permanent guardian be vacated since, he contends, the subsidiary findings and findings of the judge are not warranted by the evidence. It is the guardian ad litem's position that, even if these findings are supported by the evidence, they are legally insufficient to constitute an adequate basis for the appointment of a permanent guardian. The guardian ad litem does not, however, take issue with the findings that the ward suffers from schizophrenia, paranoid type, that he is at times psychotic, and that he is mentally ill. Although we think that the guardian was erroneously empowered to medicate his ward forcibly, see Part II, *infra*, the appointment of the guardian was otherwise proper and warranted by both the evidence and the findings.

Three psychiatrists, the ward's court-appointed attorney (who was appointed to represent the ward in pending criminal matters), the ward's father (the guardian), and the ward's mother all testified at the hearing. The first psychiatrist stated, among other things, that the ward was mentally ill, was suffering from schizophrenia, paranoid type, and was not competent either to make treatment decisions or otherwise to care for his person. The second psychiatrist, called by the guardian ad litem, expressed his opinion that the ward was mentally ill but competent to

---

tions of the transcript suggest that this may have been the case and, if so, consideration of such a factor was erroneous under the principles we articulate in Part II, *infra*. The action of the judge was, however, in accordance with the most accurate statement of the law then available. See *Rogers I*, 478 F. Supp. 1342, 1364 (D. Mass. 1979), aff'd in part, rev'd in part, 634 F.2d 650 (1st Cir. 1980) (*Rogers II*), cert. granted, 451 U.S. 906 (1981). In his findings the judge did not in any way rely upon the need to medicate the ward immediately, basing his decision instead upon the ward's need for a guardian in the ward's present (unmedicated) condition. If the judge reasoned that the ward was in need of a guardian to consent to the administration of medication, then a fortiori, the ward was in need of a guardian if no medication were administered.

care for himself in a limited sense. He expressed doubts
about the ward's ability to function in interpersonal social
circumstances without reacting with intense abrupt anger,
and further stated that the ward was incapable of carrying
on a reasonable conversation and unable to live in a com-
munity by himself. The third psychiatrist testified that the
ward suffered from schizophrenia, paranoid type, that such
a condition might cause him to react to other people with
aggression or violent behavior, that while he was hospital-
ized he attacked another resident for no apparent reason,
that such an assault "could be repeated at any time," and
that if the ward were to live at home he might present a
danger to other family members. This psychiatrist also
testified that there was "a definite danger of unprovoked
assault on other people," and concluded that the ward
could not hold a job, handle his financial affairs or care for
himself outside of his home. The other three witnesses
testified to further violent incidents involving the ward, and
two of them testified as to his obvious inability to care for
himself in all but the most protected situations.

Based upon this evidence the judge entered fifty sub-
sidiary findings and fourteen findings. The judge found,
inter alia, that the ward was mentally ill, incapable of car-
ing for himself except in the most restrictive environment,
incapable of managing his financial affairs except on a very
limited basis and incapable of being gainfully employed in
any work except under the direct supervision of his father.
These findings were clearly supported by the evidence, and,
as we explain below, with the other findings[6] they con-

_____

[6] In addition to the findings described above, the judge found:

"1. [Richard Roe], III suffers from Schizophrenia-Paranoid Type.

"2. [Richard Roe], III is psychotic.

". . . .

"7. [Richard Roe], III does not understand or comprehend his mental
illness and has no insight into his mental illness.

"8. [Richard Roe], III is incapable of understanding the benefits and
detriments of antipsychotic drug treatment.

". . . .

"13. Without the use of psychotropic medication or antipsychotic
medication in connection with the treatment of [Richard Roe], III, his

stituted a legally sufficient basis upon which to appoint a permanent guardian.

The appointment of a permanent guardian for a mentally ill person must be based upon findings that the ward (1) is incapable of taking care of himself, (2) by reason of mental illness. G. L. c. 201, § 6. See *Russell* v. *Russell*, 336 Mass. 762, 763 (1958); *Willett* v. *Willett*, 333 Mass. 323, 330 (1955); *Bashaw* v. *Willett*, 327 Mass. 369, 370 (1951). As we have previously stated, "[A] finding that a person is in need of a guardian 'due to mental illness,' is not sufficient. Clearly, the requirement that a mentally ill person be found incapable of taking care of himself lies at the very heart of a guardianship proceeding." *Fazio* v. *Fazio*, 375 Mass. 394, 399 (1978). In *Fazio* we construed the statutory phrase "incapable of taking care of himself by reason of mental illness" as "encompassing a general inability on the part of an individual to manage his own person and financial affairs, such inability being caused by mental illness." *Id.* at 403. "[T]he type of evidence necessary to support such a finding, apart from evidence as to mental illness, should consist of facts showing a proposed ward's inability to think or act for himself as to matters concerning his personal health, safety, and general welfare, or to make informed decisions as to his property or financial interests." *Id.* Unlike *Fazio*, where we found the evidence and findings to be deficient, we have in this case substantial evidence demonstrating the inability of the ward to care for his own welfare and safety, as well as evidence showing the threat he poses to the safety of others. In addition there are clear findings addressing the statutory criteria made by a judge who articulated the *Fazio* requirements during the hearing. We find no error in the appointment of a permanent guardian.

---

mental illness and condition will deteriorate and become chronic and the likelihood of improvement will substantially diminish.

"14. [Richard Roe,] Jr., is a suitable person to be appointed the permanent guardian of [Richard Roe], III."

## II. The Decision to Administer Antipsychotic Drugs to the Ward.

We begin our discussion of the medical treatment decision by noting that we are directly presented with only one question. We must decide whether the substituted judgment determination to be made in cases such as this may be delegated to the guardian. The probate judge found that the guardian did *not* propose to authorize forcible administration of antipsychotic drugs[7] immediately but rather sought contingent authority to administer such drugs if certain anticipated events took place. Under these circumstances, the question presented by the guardian was hypothetical, and any substituted judgment determination made was premature.[8] However, the judge did in fact authorize the guardian to consent to administration of antipsychotic medication for the ward. We conclude that this was error. Strictly speaking, this conclusion is sufficient to dispose of this case. Nevertheless, because of the likelihood of further proceedings in this case and the necessity of making similar determinations in other cases, we establish guidelines regarding the criteria to be used and the procedures to be followed in making a substituted judgment determination. In Part A, below, we establish that a judicial determination of substituted judgment is to be made. In Part B, we identify those factors to be considered

---

[7] Two drugs — Haldol [haloperidol) and Prolixin (fluphenazine) were recommended for the ward. Although these drugs are occasionally referred to as "psychotropic" drugs, they are more accurately described as "antipsychotic" drugs. See note 10, *infra*.

[8] It was imprudent to make a determination in these circumstances. A substituted judgment determination may only be made upon direct application of a party with standing who actually seeks the administration of the medication. A premature decision will needlessly burden all involved and will make any substituted judgment determination less accurate. The determination will become more precise as it approaches the time at which it will be implemented because, for example, the ward's choice might change as his medical condition (and other circumstances) change.

in reaching a substituted judgment determination.  If the judge determines that the ward, if competent, would accept the medication, he is to order its administration.  If the judge determines that the ward's substituted judgment would be to refuse treatment, we set forth in Part C those State interests which are capable of overwhelming the right to refuse antipsychotic medication.  If the judge finds that there is a State interest sufficient to override the ward's choice to refuse treatment, but finds that the State interest can be satisfied by means other than forced medication, we then require in Part C (3) that the ward be afforded an extended substituted judgment determination in order to choose from among all acceptable and available means of satisfying the State interest.

A. NEED FOR A COURT ORDER.

The primary dispute in this case concerns the means by which the ward is to exercise his right to refuse treatment, a right which the ward possesses but is incapable of exercising personally.[9]  The guardian's position is that the power to

---

[9] See note 13, *infra*.  That such a right exists is indisputable.  "[A] person has a constitutionally protected interest in being left free by the state to decide for himself whether to submit to the serious and potentially harmful medical treatment that is represented by the administration of antipsychotic drugs." *Rogers II, supra* at 653.  The source of this right according to *Rogers II, supra*, lies in the "Due Process Clause of the Fourteenth Amendment . . ., most likely as part of the penumbral right to privacy, bodily integrity, or personal security." *Id.*  Other courts have discussed an individual's First Amendment right to maintain the integrity of his mental processes. See *Scott* v. *Plante*, 532 F.2d 939, 946 (3d Cir. 1976); *Mackey* v. *Procunier*, 477 F.2d 877, 878 (9th Cir. 1973); *Rogers I, supra* at 1366-1367.  We ground this right firmly in the constitutional right to privacy, which we have previously described as "an expression of the sanctity of individual free choice and self-determination as fundamental constituents of life." *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 742 (1977).  We find support as well in the inherent power of the court to prevent mistakes or abuses by guardians, whose authority comes from the Commonwealth and the courts. *Buckingham* v. *Alden*, 315 Mass. 383, 389 (1944).  *Chase* v. *Chase*, 216 Mass. 394, 397 (1914).  *Hicks* v. *Chapman*, 10 Allen 463, 465 (1865).  The third factor upon which we rely is the common law right of every person "of adult years and sound mind . . . to determine what shall be done with his

exercise this right on behalf of the ward is vested in the guardian simply by virtue of his appointment as guardian. The ward claims that he is entitled to a judicial determination of substituted judgment. The question is, then, who ought to exercise this right on behalf of the ward? We think that this question is best resolved by requiring a judicial determination in accordance with the substituted judgment doctrine.

We have in the past stated our preference for judicial resolution of certain legal issues arising from proposed extraordinary medical treatment. *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 759 (1977). *Matter of Spring*, 380 Mass. 629, 635 (1980). See *Rogers II*, 634 F.2d 650 (1st Cir. 1980), cert. granted, 451 U.S. 906 (1981). We reaffirm this preference in the circumstances shown here. While we are mindful that "[t]he judicial model for factfinding for all constitutionally protected interests, regardless of their nature, can turn rational decision-making into an unmanageable enterprise," *Parham* v. *J.R.*, 442 U.S. 584, 608 n.16 (1979), the question presented today seems "to require the process of detached but passionate investigation and decision that forms the ideal on which the judicial branch of government was created," *Saikewicz, supra.*

The question presented by the ward's refusal of antipsychotic drugs is only incidentally a medical question. Absent an overwhelming State interest, a competent individual has the right to refuse such treatment. To deny this right to persons who are incapable of exercising it personally is to degrade those whose disabilities make them wholly reliant on other, more fortunate, individuals. In order to accord proper respect to this basic right of all individuals, we feel that if an incompetent individual refuses antipsychotic

own body." *Schloendorff* v. *Society of N.Y. Hosp.*, 211 N.Y. 125, 129 (1914) (Cardozo, J.). We have held that the incompetence of a ward does not allow his guardian to exercise vicariously this common law right regarding extraordinary treatment. *Saikewicz, supra.* Cf. G. L. c. 201, §§ 6, 6A; G. L. c. 111, § 70E(*l*).

drugs, those charged with his protection must seek a judicial determination of substituted judgment. No medical expertise is required in such an inquiry, although medical advice and opinion is to be used for the same purposes and sought to the same extent that the incompetent individual would, if he were competent. We emphasize that the determination is *not* what is medically in the ward's best interests — a determination better left to those with extensive medical training and experience. The determination of what the incompetent individual would do if competent will probe the incompetent individual's values and preferences, and such an inquiry, in a case involving antipsychotic drugs, is best made in courts of competent jurisdiction.

There is no bright line dividing those decisions which are (and ought to be) made by a guardian, from those for which a judicial determination is necessary. The tension which makes such a line so difficult to draw is apparent. There is an obvious need for broad, flexible, and responsive guardianship powers, but simultaneously there is a need to avoid the serious consequences accompanying a well-intentioned but mistaken exercise of those powers in making certain medical treatment decisions.

We have recently identified the factors to be taken into account in deciding when there must be a court order with respect to medical treatment of an incompetent patient. "Among them are at least the following: the extent of impairment of the patient's mental faculties, whether the patient is in the custody of a State institution, the prognosis without the proposed treatment, the prognosis with the proposed treatment, the complexity, risk and novelty of the proposed treatment, its possible side effects, the patient's level of understanding and probable reaction, the urgency of decision, the consent of the patient, spouse, or guardian, the good faith of those who participate in the decision, the clarity of professional opinion as to what is good medical practice, the interests of third persons, and the administrative requirements of any institution involved." *Matter of Spring, supra* at 637. Without intending to indicate the

relative importance of these and other factors in all cases, it is appropriate to identify some of those factors which are weighty considerations in this particular case. They are: (1) the intrusiveness of the proposed treatment, (2) the possibility of adverse side effects, (3) the absence of an emergency, (4) the nature and extent of prior judicial involvement, and (5) the likelihood of conflicting interests.

(1) *The intrusiveness of the proposed treatment.* We can identify few legitimate medical procedures which are more intrusive than the forcible injection of antipsychotic medication.[10] "In general, the drugs influence chemical transmissions to the brain, affecting both activatory and inhibitory functions. Because the drugs' purpose is to reduce the level of psychotic thinking, it is virtually undisputed that they are mind-altering." *Rogers I, supra* at 1360. A single injection of Haldol, one of the antipsychotic drugs proposed in this case, can be effective for ten to fourteen days. The drugs are powerful enough to immobilize mind and body. Because of both the profound effect that these drugs have on the thought processes of an individual and the well-established likelihood of severe and irreversible adverse

---

[10] The doctors who testified in the proceedings below used the terms psychotropic ("acting on the mind") and antipsychotic ("tending to alleviate psychosis or psychotic states") interchangeably. Webster's New Collegiate Dictionary, at 50, 924 (1979). The distinction between the two terms has been subject to confusion in the past. See *Rogers II, supra* at 653 n.1. The specific drugs recommended in this case, Prolixin (fluphenazine) and Haldol (haloperidol), are both classed as "major tranquilizers" or "neuroleptics." Plotkin, Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment, 72 Nw. U.L. Rev. 461, 474 n.75 & n.77 (1977). See generally Physicians' Desk Reference 1116-1118, 1728-1733 (35th ed. 1981). Their use is characterized by "(1) marked sedation, without sleep; (2) effectiveness in the most intensely agitated and excited patient; (3) progressive disappearance of symptoms in acute and chronic psychoses; (4) extra-pyramidal reaction; and (5) subcortical site of action." Plotkin, *supra* at 474 n.75. We refer to these drugs as "antipsychotic" drugs, "a more generally accepted and less confusing designation than other terminology." American College of Neuropsychopharmacology-Food and Drug Administration Task Force, Neurologic Syndromes Associated with Antipsychotic Drug Use, 289 New England J. Med. 20, 20 (1973).

side effects, see Part II A (2) *infra*, we treat these drugs in the same manner we would treat psychosurgery or electro-convulsive therapy. Compare Plotkin, Limiting the Thera-peutic Orgy: Mental Patients' Right to Refuse Treatment, 72 Nw. U.L. Rev. 461, 466-474 (1977), with *id*. at 474-479. Additionally, "clinicians have encountered great difficulty in scientifically predicting a particular individual's response to a particular drug, and the results frequently appear para-doxical or idiosyncratic." *Id*. at 474-475. The record in this case indicates that if the drugs were mistakenly administered to a nonpsychotic individual, then that individual might develop a "toxic psychosis," causing him to suffer symptoms of psychosis. While the actual physical invasion involved in the administration of these drugs amounts to no more than an injection, the impact of the chemicals upon the brain is suffi-cient to undermine the foundations of personality.

While antipsychotic drugs can actually lessen the amount and intensity of psychotic thinking, among the most impor-tant reasons for their continued use is to control behavior.[11]

---

[11] The obvious potential for misuse of these drugs provides an additional reason to require judicial approval prior to the forcible use of antipsychotic drugs upon incompetent individuals. Another court, which in the past has not required court orders regarding the termination of life support equip-ment, now requires a court order before administration of treatment which has been "subject to abuse in the past." *In re Grady*, 85 N.J. 235, 252 (1981) (Slip op. at 20 [Feb. 18, 1981]). Compare *In re Quinlan*, 70 N.J. 10, cert. denied sub nom. *Garger* v. *New Jersey*, 429 U.S. 922 (1976), with *In re Grady, supra*. Commentators and courts have identified abuses of anti-psychotic medication by those claiming to act in an incompetent's best in-terests. See Plotkin, *supra*; Baldessarini & Lipinski, Risks vs. Benefits of Antipsychotic Drugs, 289 New England J. Med. 427 (1973); Comment, Ad-vances in Mental Health: A Case for the Right to Refuse Treatment, 48 Temple L.Q. 354, 364 (1975). See also *Mackey* v. *Procunier*, 477 F.2d 877 (9th Cir. 1973); *Rennie* v. *Klein*, 476 F. Supp. 1294 (D.N.J. 1979); *Pena* v. *New York State Div. for Youth*, 419 F. Supp. 203, 207 (S.D.N.Y. 1976); *Nelson* v. *Heyne*, 355 F. Supp. 451, 455 (N.D. Ind. 1972), aff'd 491 F. 2d 352 (7th Cir.), cert. denied, 417 U.S. 976 (1974).

The Supreme Court of New Jersey reasoned that a court "must ensure that the law does not allow abuse to continue." *In re Grady, supra*. We agree. The power of the State — and those empowered to act by the State — to administer mind-altering medication must be carefully circum-scribed by guidelines and closely scrutinized for abuse. "Whatever

Plotkin, *supra* at 478. "[T]hese drugs have been inten-
tionally used for disciplinary purposes, and they have been
unintentionally misused as a result of either ignorance or in-
adequate resources. While psychotropic drugs may play a
significant role in the treatment of psychiatric disorders,
there is no wisdom in permitting their continued indis-
criminate use upon unconsenting persons or upon persons
who are uninformed as to their potential consequences." *Id.*
at 478-479.

(2) *The possibility of adverse side effects.* Although, as
we establish above, the intended effects of antipsychotic
drugs are extreme, their unintended effects are frequently
devastating and often irreversible. The adverse side effects
accompanying administration of antipsychotic drugs have
been known since the late 1950's. Baldessarini & Lipinski,
Risks vs. Benefits of Antipsychotic Drugs, 289 New England
J. Med. 427, 428 (1973). "'[T]oxic' effects regularly ac-
company the use of antipsychotic drugs to ameliorate
schizophrenic symptoms. The most common results are the
temporary, muscular side effects (extra-pyramidal symp-
toms) which disappear when the drug is terminated;
dystonic reactions (muscle spasms, especially in the eyes,
neck, face, and arms; irregular flexing, writhing or grimac-
ing movements; protrusion of the tongue); akathesia (in-
ability to stay still, restlessness, agitation); and Parkinson-
isms (mask-like face, drooling, muscle stiffness and rigidity,
shuffling gait, tremors). Additionally, there are numerous
other nonmuscular effects, including drowsiness, weakness,
weight gain, dizziness, fainting, low blood pressure, dry
mouth, blurred vision, loss of sexual desire, frigidity,
apathy, depression, constipation, diarrhea, and changes in
the blood. Infrequent, but serious, nonmuscular side ef-
fects, such as skin rash and skin discoloration, ocular
changes, cardiovascular changes, and occasionally, sudden
death, have also been documented.

powers the Constitution has granted our government, involuntary mind
control is not one of them, absent extraordinary circumstances." *Rogers
I, supra* at 1367.

"The most serious threat phenothiazines [one type of antipsychotic drug] pose to a patient's health is a condition known as tardive dyskinesia. This effect went unrecognized for years because its symptoms are often not manifested until late in the course of treatment, sometimes appearing after discontinuation of the drug causing the condition. Tardive dyskinesia is characterized by involuntary muscle movements, often in the oral region. The associated rhythmic movements of the lips and tongue (often mimicking normal chewing, blowing, or licking motions) may be grotesque and socially objectionable, resulting in considerable shame and embarrassment to the victim and his or her family. Additionally, hypertrophy of the tongue and ulcerations of the mouth may occur, speech may become incomprehensible, and, in extreme cases, swallowing and breathing may become difficult. To date, tardive dyskinesia has resisted curative efforts, and its disabling manifestations may persist for years.

"There is little doubt that prolonged administration of psychoactive drugs plays a major role in the development of tardive dyskinesia. Individual susceptibility to the condition depends upon a variety of factors including increasing age, sex, and the existence of organic brain syndromes" (footnotes omitted). Plotkin, *supra* at 475-477. Commentators and courts have found that antipsychotic drugs are high-risk treatment.[12] "Tardive dyskinesia is the most important complication of long-term neuroleptic use. What was initially thought to be a rare clinical curiosity has become a significant public health hazard." Jeste & Wyatt, Changing Epidemiology of Tardive Dyskinesia: An Overview, 138 Am. J. Psych. 297, 297 (1981). "[T]he risks of

---

[12] We admit the possibility and express the hope that future medical advances may produce antipsychotic drugs free from the severe adverse side effects we have described above. At the same time, it must be noted that the intended effect of the medication — to alter mental processes — by definition cannot be eliminated from those drugs we have described as "antipsychotic." Nevertheless, we do not foreclose reconsideration of these issues when and if it can be shown that the characteristics of antipsychotic drugs have changed.

iatrogenically produced chronic neurologic disability are alarming." Baldessarini & Lipinski, *supra* at 428. See generally Jeste & Wyatt, *supra*; American College of Neuropsychopharmacology-Food and Drug Administration Task Force, Neurologic Syndromes Associated with Antipsychotic-Drug Use, 289 New England J. Med. 20 (1973); Crane, Tardive Dyskinesia in Patients Treated with Major Neuroleptics: A Review of the Literature, 124 Am. J. Psych. 40 (Feb. Supp. 1968). See also *Scott v. Plante*, 532 F.2d 939, 945 n.8 (3d Cir. 1976); *Rogers I, supra* at 1360; *Rennie v. Klein*, 462 F. Supp. 1131, 1136-1138 (D.N.J. 1978); *In re Boyd*, 403 A.2d 744, 752 (D.C. App. 1979).

(3) *The absence of an emergency.* The evidence presented in the proceedings below makes it quite clear that the probate judge was not presented with a situation which could accurately be described as an emergency. We accept the dictionary definition of "emergency": "an unforeseen combination of circumstances or the resulting state that calls for immediate action." Webster's Third New Int'l Dictionary, at 741 (1961). Medical evidence showed that the ward apparently had been schizophrenic for four years, without more than slight or temporary improvement, and that without treatment his mental health could deteriorate. Expert testimony indicated that the prognosis for most individuals with untreated schizophrenia was "gradual worsening." In an attempt to elicit an individual prognosis, counsel for the guardian posed a significant question to the expert. "[I]s there a point in time, Doctor, where the failure to initiate treatment by drug therapy would result in [the ward's] condition being substantially impaired or irreparably impaired in terms of bringing any treatment to him that would help him?" The doctor responded, "Well, the longer one waits, the more chance there is of the condition becoming chronic." No follow-up questions were asked. We think that the possibility that the ward's schizophrenia might deteriorate into a chronic, irreversible condition at an uncertain but relatively distant date does not satisfy our definition of emergency, especially where, as

here, the course of the illness is measured by years and no crisis has been precipitated. Cf. *Rogers II, supra* at 654; *Rogers I, supra* at 1364.

We are not called upon here to decide under which circumstances an emergency might relieve a guardian from the obligation of seeking a judicial determination of substituted judgment which would otherwise be required. We do, however, emphasize that in determining whether an emergency exists in terms of requiring "immediate action," the relevant time period to be examined begins when the claimed emergency arises, and ends when the individual who seeks to act in the emergency could, with reasonable diligence, obtain judicial review of his proposed actions. This time period will, of course, be brief — as we noted in *Matter of Spring, supra* at 642, "expedited decision can be obtained when appropriate." We recognize that "the interests of the patient himself would [not] be furthered by requiring responsible [parties] to stand by and watch him slip into possibly chronic illness while awaiting an adjudication." *Rogers II, supra* at 660. However, the evidence shows that this is not such a case — in fact, unless the course of a disease is measured by hours, there need never be such a case in the courts of this Commonwealth. We are certain that every judge recognizes that in any case where there is a possibility of immediate, substantial, and irreversible deterioration of a serious mental illness, even the smallest of avoidable delays would be intolerable.

(4) *The nature and extent of prior judicial involvement.* For the past four years the ward has rejected antipsychotic medication on every occasion on which it has been offered, and there has been no judicial finding of incapacity relative to many of these occasions. It is possible that in some cases, although not in the instant case, a mentally ill ward may retain sufficient competence to make treatment decisions himself, thereby eliminating the need for a substituted judgment determination.[13] It has been held that patients involuntarily

---

[13] In separate findings the probate judge concluded that Richard Roe, III, was not competent either to understand his illness or to evaluate his treatment choices.

committed to State mental hospitals are entitled to a judicial determination of incapacity before they may be forcibly medicated with mind-altering drugs.[14] *Rogers II, supra* at 661. This is because the "commitment decision itself is an inadequate predicate to the forcible administration of drugs to an individual where the purported justification for that action is the State's *parens patriae* power." *Id.* at 659. Cf. *Boyd* v. *Board of Registrars of Voters of Belchertown*, 368 Mass. 631, 635-636 (1975) ("profound" distinction between commitment and determination of incompetency). A person is presumed to be competent unless shown by the evidence not to be competent.[15] *Lane* v. *Candura*, 6 Mass. App. Ct. 377, 382 (1978). Similarly, in the absence of an independent finding of incompetency to make treatment decisions, we cannot assume that a mentally ill ward lacks the capacity to make a treatment decision of this magnitude. Cf. *In re Grady*, 81 N.J. 235, 265 (1981).

In a case such as the one before us, some judicial involvement is unavoidable inasmuch as the judge must: (1) appoint the guardian, and (2) determine the ward's competency to make treatment decisions. This significant and inescapable prior judicial involvement eliminates much concern we might otherwise have about requiring a further judicial determination, since one of the factors we consider in deciding whether the guardian is to make the substituted judgment determination is the amount of additional time which will be needed to obtain a judicial determination. While this prior involvement is not conclusive in and of itself, it is a factor to be considered in determining whether a court order must be obtained.

(5) *The likelihood of conflicting interests.* Decisions such as the one the guardian wishes to make in this case pose ex-

---

[14] We express no opinion concerning whether such a finding is sufficient judicial involvement to permit other persons to make subsequent medical treatment decisions for involuntarily committed patients.

[15] This presumption continues even while the person is committed to a public or private institution. G. L. c. 123, § 25.

ceedingly difficult problems for even the most capable, detached, and diligent decisionmaker. We intend no criticism of the guardian when we say that few parents could make this substituted judgment determination — by its nature a self-centered determination in which the decisionmaker is called upon to ignore all but the implementation of the values and preferences of the ward — when the ward, in his present condition, is living at home with other children. Cf. *Matter of Spring*, 380 Mass. 629, 640 n.3 (1980); *In re Grady, supra* at 252. Nor do we think that the father was not a suitable person to be appointed guardian. Those characteristics laudable in a parent might often be a substantial handicap to a guardian faced with such a decision but who might in all other circumstances be an excellent guardian. Cf. *Ruby* v. *Massey*, 452 F. Supp. 361, 365 n.15 (D. Conn. 1978). A judicial determination also benefits the guardian, who otherwise might suffer from lingering doubts concerning the propriety of his decision.

Each individual involved, when called upon to participate in the substituted judgment determination, is assisting in the attempt to determine the ward's values and preferences. The guardian will usually play a major role in this process. The formalities and discipline inherent in a judicial determination will impress upon all involved the need for objectivity and selflessness. We are convinced that in this case, as in other cases, the regularity of the procedure — guaranteed by a judicial determination — will ensure that objectivity which other processes might lack.

B. RELEVANT FACTORS IN THE SUBSTITUTED JUDGMENT
   DETERMINATION.

The immediate question confronting us is resolved by our conclusion that, when a timely determination needs to be made, it is to be made by a judge. However, because of the likelihood that a proper determination will be sought by these or other parties in the future, we set forth below guidelines to be followed in order to ensure accuracy and consistency in proceedings in the Probate Court.

The factors we identify below are to be considered by the probate judge in order to identify the choice "which would be made by the incompetent person, if that person were competent, but taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person." *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 752-753 (1977). The determination must "give the fullest possible expression to the character and circumstances of that individual." *Id.* at 747. We observe that this is a subjective rather than an objective determination.[16] Cf. *id.* at 746-747. All persons involved in such an inquiry will readily admit that the bounds of relevance therefor are exceedingly broad. In this search, procedural intricacies and technical niceties must yield to the need to know the actual values and preferences of the ward. In this spirit we briefly identify the following relevant factors, cautioning that they are not exclusive, recognizing that certain of them may not exist in all cases, and declining to establish their relative weights in any individual case. They are: (1) the ward's expressed preferences regarding treatment; (2) his religious beliefs; (3) the impact upon the ward's family; (4) the probability of adverse side effects; (5) the consequences if treatment is refused; and (6) the prognosis with treatment.

(1) *The ward's expressed preferences regarding treatment.* If the ward has expressed a preference while not sub-

---

[16] It has been suggested that the substituted judgment determination as it has been formulated in our cases "is only a 'legal fiction' when used for never-competent persons, because it is impossible to ascertain what such persons think is in their own best interests." Swazey, Treatment & Non-treatment Decisions: In whose Best Interests?, in Dilemmas of Dying 95, 96-97 (C. Wong and J. Swazey, eds. 1981). However, the fact that in such an unfortunate case the substituted judgment doctrine is so difficult to apply provides inadequate justification for denying its benefits in those cases wherein it is more feasible to utilize the doctrine. Cf. *Saikewicz, supra* at 750 n.15, 753-755. "While it may thus be necessary to rely to a greater degree on objective criteria . . . the effort to bring the substituted judgment into step with the values and desires of the affected individual must not, and need not, be abandoned." *Id.* at 751.

jected to guardianship — and presumably competent, *Lane
v. Candura, supra* at 382, — such an expression is entitled
to great weight in determining his substituted judgment
unless the judge finds that either: (a) simultaneously with
his expression of preference the ward lacked the capacity to
make such a medical treatment decision, or (b) the ward,
upon reflection and reconsideration, would not act in ac-
cordance with his previously expressed preference in the
changed circumstances in which he currently finds himself.
Cf. *In re Boyd*, 403 A.2d 744, 751 (D.C. App. 1979).

Even if the ward lacks capacity to make treatment deci-
sions, his stated preference is entitled to serious considera-
tion as a factor in the substituted judgment determination.
"Although [the ward] failed to understand his mental
condition and his need for treatment, we think his stated
preference must be treated as a critical factor in the deter-
mination of his 'best interests.'" *Doe* v. *Doe*, 377 Mass.
272, 279 (1979). This respect for the ward's preference and
the reasons for this deference have long been recognized in
our cases. "A man may be insane so as to be a fit subject for
guardianship, and yet have a sensible opinion and strong
feeling upon the question who that guardian shall be. And
that opinion and feeling it would be the duty as well as the
pleasure of the court anxiously to consult, as the happiness
of the ward and his restoration to health might depend upon
it." *Allis* v. *Morton*, 4 Gray 63, 64 (1855).

(2) *The ward's religious beliefs.* An individual might
choose to refuse treatment if the acceptance of such treat-
ment would be contrary to his religious beliefs. If such a
reason is proffered by or on behalf of an incompetent, the
judge must evaluate it in the same manner and for the same
purposes as any other reason: the question to be addressed
is whether certain tenets or practices of the incompetent's
faith would cause him individually to reject the specific
course of treatment proposed for him in his present circum-
stances. We adopt the approach taken by the court in *In re
Boyd*, 403 A.2d 744 (D.C. App. 1979). In *Boyd* the court
detailed the spectrum of tenacity with which an individual

may adhere to religious beliefs and practices, and identified various factors to be considered in determining whether an individual would act consistently with previously held beliefs under unexpected circumstances. *Id.* at 751-752. Compare Developments in the Law — Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190, 1218 n.95 (1974). While in some cases an individual's beliefs may be so absolute and unequivocal as to be conclusive in the substituted judgment determination, in other cases religious practices may be only a relatively small part of the aggregated considerations.

(3) *The impact upon the ward's family.* An individual who is part of a closely knit family would doubtless take into account the impact his acceptance or refusal of treatment would likely have on his family. Such a factor is likewise to be considered in determining the probable wishes of one who is incapable of formulating or expressing them himself. In any choice between proposed treatments which entail grossly different expenditures of time or money by the incompetent's family, it would be appropriate to consider whether a factor in the incompetent's decision would have been the desire to minimize the burden on his family. If this factor would have been considered by the individual, the judge must enter it into the balance in making the substituted judgment determination. If an incompetent has enjoyed close family relationships and subsequently is forced to choose between two treatments, one of which will allow him to live at home with his family and the other of which will require the relative isolation of an institution, then the judge must weigh in his determination the affection and assistance offered by the incompetent's family. We note, however, that the judge must be careful to avoid examination of these factors in any manner other than one actually designed and intended to effectuate the incompetent's right to self-determination. As we discuss fully in Part C, *infra,* if there are no overriding State interests,[17]

---

[17] Preeminent among the State interests assertable in this context is the State's parens patriae responsibility to protect the interests of dependent children. We recognize that this State interest is capable of overwhelming the right of a patient to refuse medical treatment.

then the values and preferences of any institutions or persons other than the incompetent are irrelevant except in so far as they would affect his choice.

(4) *The probability of adverse side effects.* We have described the adverse side effects of antipsychotic medication in Part II A (2), *supra.* Clearly any competent patient choosing whether to accept such treatment would consider the severity of these side effects, the probability that they would occur, and the circumstances in which they would be endured. The judge must also consider these factors in arriving at a determination of substituted judgment on behalf of an incompetent. *Saikewicz, supra* at 753-755.

(5) *The consequences if treatment is refused.* If the prognosis without treatment is that an individual's health will steadily, inevitably and irreversibly deteriorate, then that person will, in most circumstances, more readily consent to treatment which he might refuse if the prognosis were more favorable or less certain. This general rule, however, will not always indicate whether an individual would, if competent, accept treatment. For example, in regard to the religious beliefs we discussed in Part II B (2), *supra,* "even in a life-or-death situation one's religion can dictate a 'best interest' antithetical to getting well." *In re Boyd, supra* at 750. This factor, as all the rest of the factors, must be utilized to reach an individual determination. While no judge need ignore the basic logic and common values which ordinarily underlie individual preference, he must reach beyond statistical factors and general rules to see "the complexities of the singular situation viewed from the unique perspective of the person called on to make the decision." *Saikewicz, supra* at 747.

(6) *The prognosis with treatment.* We think it can fairly be stated as a general proposition that the greater the likelihood that there will be cure or improvement,[18] the more

[18] The benefits obtainable from medical treatment today range from immediate and complete cure to only the retardation of accelerating deterioration. We recognize that in many unfortunate situations existing "cures" only prevent significant deterioration.

likely an individual would be to submit to intrusive treatment accompanied by the possibility of adverse side effects. Additionally, professional opinion may not always be unanimous regarding the probability of specific benefits being received by a specific individual upon administration of a specific treatment.  Both of these factors — the benefits sought and the degree of assurance that they actually will be received — are entitled to consideration.

Finally, the judge making the substituted judgment determination should address, in the following manner, each of the six factors we have described above, as well as any others relevant in the case before him.  He is to make written findings for each factor, indicating within each finding those reasons both for and against treatment.  Cf. *Saikewicz, supra* at 733-735.  Following this he must analyze the relative weight of the findings in that particular case.  On this basis he is to conclude whether the substituted judgment of the incompetent would be to accept or reject treatment. If the determination is to accept treatment, the judge is to order its administration.[19]  If the determination is to refuse treatment, the judge may order treatment only in accordance with the procedures we discuss in Part C, *infra*.

## C.  THE ACCOMMODATION OF OVERRIDING STATE INTERESTS.

There are circumstances in which the fundamental right to refuse extremely intrusive treatment must be subordinated to various State interests.

(1) *The State interests involved.*  Among the State interests which we have identified in our prior cases are: "(1) the preservation of life; (2) the protection of the interests of

---

[19] In his order the judge may appropriately authorize a treatment program which utilizes various specifically identified medications administered over a prolonged period of time.  In such a case, the order should provide for periodic review to determine if the ward's condition and circumstances have substantially changed.  Any party with standing may seek modification of such an order at any reasonable time.  Cf. *Rogers I, supra* at 1363.

innocent third parties; (3) the prevention of suicide; and (4) maintaining the ethical integrity of the medical profession." *Saikewicz, supra* at 741. These four State interests are not exhaustive, and other State interests may also deserve consideration. For example, in *Commissioner of Correction* v. *Myers*, 379 Mass. 255 (1979), we held that the State's interest in orderly prison administration was a sufficient countervailing State interest to compel an inmate to submit to hemodialysis. *Id.* at 265-266. The present case is unlike *Myers* in that the ward is not in the custody of a State institution, and therefore those legitimate State concerns dealing with the preservation of institutional order and the maintenance of efficiency are not relevant here. Cf. *Commissioner of Correction* v. *Myers, supra*; *Rogers I, supra* at 1368-1371.

In the present case the judge found that the State had a vital interest in seeing that its residents function at the maximum level of their capacity and that this interest outweighed the rights of the individual. We disagree. While the State, in certain circumstances, might have a generalized parens patriae interest in removing obstacles to individual development, this general interest does not outweigh the fundamental individual rights here asserted.[20]

---

[20] The factors which concerned the judge — the natural desire to prevent suffering and the need of each individual to maintain and improve his capabilities — are better viewed as likely foundations of individual preference to be considered in the substituted judgment determination. See Part II B (5), *supra*. Where the medical evidence, unchallenged at every turn and unimpeachable in its sincerity, shows that treatment will maintain or regain competence, this is a weighty factor to be considered by the judge as it would be considered by the affected individual. It is not conclusive, however. If the judge feels that the "best interests" of the ward demand one outcome but concludes that the ward's substituted judgment would require another, then, in the absence of an overriding State interest, the substituted judgment prevails. In short, if an individual would, if competent, make an unwise or foolish decision, the judge must respect that decision as long as he would accept the same decision if made by a competent individual in the same circumstances. Cf. *Lane* v. *Candura*, 6 Mass. App. Ct. 377, 383 (1978); *Custody of a Minor* (*No. 3*), 378 Mass. 732, 744-745 (1979). We digress concerning this "right to be wrong" only to establish the relationship between the "best interests" standard and the substituted judgment determination. "Extreme cases

The preservation of life, "the most significant of the asserted State interests," *Saikewicz, supra* at 741, is not assertable in this case, as the proposed treatment is not intended to prolong life. There is no evidence that the ward is suicidal, nor is there evidence that medical ethics are seriously implicated. In the past we have interpreted the phrase "the protection of the interests of innocent third parties" as representing the State's interest in protecting minor children from the emotional and financial consequences of the decision of a competent adult to refuse life-saving or life-prolonging treatment.[21] *Id.* at 741-743. We have identified this as a State interest of considerable magnitude. Equally deserving of such regard is the State interest in preventing the infliction of violence upon members of the community[22] by individuals suffering from severe mental illness. This is a second aspect of the State interest in protecting innocent third parties. Although few would question that this interest is capable of overriding the individual's right to refuse treatment, a substantial question remains as to the likelihood of violence which must be established in order to support forced administration of antipsychotic medication.

(2) *The standard of proof required to justify administration of antipsychotic drugs to an unconsenting, noninstitutionalized individual.* Once it is recognized that the State's interest in the prevention of violence is capable of overriding the individual's right to refuse, it must also be recognized that the character of the government intrusion then changes. The primary purpose of the treatment is not to implement the substituted judgment of the incompetent, nor is it intended to administer treatment thought to be in his best interests. It bears emphasis that public safety then becomes the primary justification for such treatment.

can be readily suggested. Ordinarily such cases are not safe guides in the administration of the law." *Jacobson* v. *Massachusetts*, 197 U.S. 11, 38 (1905) (Harlan, J.)

[21] This particular aspect of the State interest is inapplicable in the instant case because the ward is unmarried and has no minor children.

[22] See note 23, *infra*.

Under these circumstances antipsychotic drugs function as chemical restraints forcibly imposed upon an unwilling individual who, if competent, would refuse such treatment. Examined in terms of personal liberty, such an infringement is at least the equal of involuntary commitment to a State hospital. Accordingly, we think that the same standard of proof is applicable in both involuntary commitment and involuntary medication proceedings.

In order to commit an individual to a State hospital without his consent, the likelihood of serious harm must be established beyond a reasonable doubt. *Superintendent of Worcester State Hosp.* v. *Hagberg*, 374 Mass. 271, 275-277 (1978). In G. L. c. 123, § 1, as amended through St. 1980, c. 571, § 1 (the statute governing involuntary commitment), the likelihood of serious harm is defined as "(1) a substantial risk of physical harm to the person himself as manifested by evidence of threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person's judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community." Absent criminal conduct, this statutory definition establishes the earliest moment at which the State may intervene to deny an individual his liberty based upon a prediction of future harmfulness. The State may not justify its intervention on a lower standard merely because it proposes to utilize antipsychotic drugs rather than physical restraints.

(3) *The extended substituted judgment determination.* Since the standard of proof is the same for both involuntary commitment and involuntary administration of antipsychotic medication, in any case where the State's interest in preventing violence in the community has been found

sufficient to override the individual's right to refuse treatment, two means are then available for protecting this State interest.[23] In such cases, that lesser intrusive means of restraint which adequately protects the public safety is to be used.[24] The right to the least intrusive means is derived from the right to privacy, which stands as a constitutional expression of the "sanctity of individual free choice and self-determination as fundamental constituents of life." *Saikewicz, supra* at 742. In order to satisfy the least intrusive means test, the incompetent is entitled to choose, by way of substituted judgment, between involuntary commitment and involuntary medication. Such an extended substituted judgment proceeding differs from the substituted judgment determination we describe in Part II B, *supra*, only in that the outcome is limited to involuntary commitment or involuntary medication.[25]

### III. The Limits of Our Decision.

In this opinion we have established that a guardian may be appointed for an individual upon a showing that it is

---

[23] We do not mean to suggest that once an individual has been involuntarily committed he is then subject to involuntary medication because his potential harmfulness has been established by his commitment. We have defined the State interest here as the prevention of violence in the community. By "community" we mean those persons likely to encounter the mentally ill individual outside of an institutional setting. This State interest is extinguished when the individual is institutionalized. We do not address the question whether and to what extent the State interest in *institutional* order and safety may be capable of overwhelming the right of an involuntarily committed individual to refuse medical treatment. Cf. *Baker* v. *Carr*, 369 U.S. 186, 204 (1962); *Commissioner of Correction* v. *Myers*, 379 Mass. 255 (1979); *Rogers II, supra*; *Rogers I, supra*.

[24] We are unwilling to establish a universal rule as to which is less intrusive — involuntary commitment or involuntary medication with mind-altering drugs. Since we feel that such a determination must be individually made, we conclude that the lesser intrusive means is the means of restraint which would be chosen by the ward if he were competent to choose.

[25] We do not perceive any State interest here sufficient to override the incompetent's right to self-determination. Certainly the public safety provides no such interest since it is sufficiently protected by restricting the incompetent's options to these two alternatives.

more likely than not that the individual is unable to care for himself by reason of mental illness. In addition we have held that, where no emergency exists, antipsychotic medication may be forcibly administered to a noninstitutionalized individual only in accordance with a court order. We have set forth guidelines delineating the circumstances in which a judge is to direct the administration of such treatment. These circumstances are: (1) where a judicial substituted judgment determination indicates that the incompetent individual would, if competent, accept antipsychotic drugs, or (2) where there exists a State interest of sufficient magnitude to override the individual's right to refuse. If the asserted State interest is the prevention of violent conduct by noninstitutionalized mentally ill individuals, then, upon a showing equivalent to that necessary to commit an individual against his will, the State is entitled to force the individual to choose, by way of substituted judgment, either involuntary commitment or medication with antipsychotic drugs.

While we emphasize those conclusions we have reached and the circumstances in which they are to be utilized, it is prudent to note that our guidelines are not directed toward a single case but rather identify the decisionmaking processes necessary to reach outcomes in a type of case. It is apparent from our decision today that the right of an individual to refuse treatment is not absolute but is, rather, a right to be counterbalanced against State interests. The proper balance to be struck in a given situation can only be determined after examining the specifically defined and precisely articulated interests of those who are or will be actually affected by the decision. The weight to be afforded these interests is impossible to predetermine, and the balance will vary according to the circumstances of those asserting the interests. For these reasons, we decline to strike the balance in any individual case. Specifically, we decline to rule on the right of patients confined against their will to State hospitals to refuse antipsychotic medication. We do not mean to imply that these patients' rights are wholly unprotected or that

their circumstances are entirely dissimilar to those we have discussed. We do suggest, however, that it would be imprudent to establish prematurely the relative importance of adverse interests when each may be capable of being controlling and each draws its importance from the circumstances in which it is asserted.

The ward in this case, though institutionalized at the time the temporary guardian was appointed, is currently living at home and has done so for many months. Indeed, the two occasions on which he was institutionalized were for observation and report pursuant to G. L. c. 123, §§ 15 (b) and 16 (a), and were not involuntary civil commitments. The guardian cannot now institutionalize the ward unless he establishes beyond a reasonable doubt that failure to commit would create a likelihood of serious harm. *Doe* v. *Doe*, 377 Mass. 272 (1979). No antipsychotic medication has yet been administered to him.

In addition to observing that it would be improper to establish the extent to which persons other than a noninstitutionalized individual in a nonemergency situation are entitled to a judicial substituted judgment determination, we wish to emphasize as well that in this case we treat the ward's right to a determination only in so far as it concerns antipsychotic medication. The spectrum of medical care available to individuals and the diverse circumstances in which it may be administered do not permit us to make universal rules in anticipation of cases involving different treatment or different circumstances. Even when a medical treatment decision is confined to a single set of circumstances, it is often difficult to formulate and apply a uniform and predictable standard. Compare *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728 (1977), with *Matter of Dinnerstein*, 6 Mass. App. Ct. 466 (1978). See also *Matter of Spring*, 380 Mass. 629, 637 (1980).

Our guidelines make clear that if the guardian seasonably petitions the Probate Court for an order directing the administration of antipsychotic medication to the ward, then the petition should receive prompt and full consideration.

Since no such request was before the probate judge, his order authorizing involuntary treatment was premature. We therefore vacate the order in so far as it allows the ward to be medicated over his objection. The remainder of the order, appointing Richard Roe, Jr., as guardian of his son, Richard Roe, III, is affirmed.

*So ordered.*