**In re Chad Eric SWAN.**

Supreme Judicial Court of Maine.

Argued Jan. 23, 1990.

Decided Jan. 23, 1990.

Opinion Issued Feb. 15, 1990.

Janet T. Mills (orally), Dist. Atty., Auburn, for appellant.

Arthur J. Greif (orally), Isaacson & Raymond, P.A., Lewiston, for the Swan family.

Jennifer Nichols Ferguson (orally), Fales & Fales, Auburn, guardian ad litem.

Michael Poulin (orally), Skelton, Taintor & Abbott, Auburn, for Cent. Maine Medical Center.

Leigh Ingalls Saufley (orally), Deputy Atty. Gen., Human Services Div., Augusta, for Dept. of Human Services.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

PER CURIAM.

In this case we revisit the sensitive question, first addressed by *In re Gardner*, 534 A.2d 947 (Me.1987), of when life-sustaining procedures may be discontinued for a hospital patient in a persistent vegetative state without hope of improvement. The case at bar differs from *Gardner* in two respects. Whereas Joseph Gardner was about 21, Chad Swan, the patient here, was 17⅓ years old when, shortly before the auto accident that left him in a persistent vegetative state, he expressed his desire not to be maintained artificially in that condition, but rather to be allowed to die. Also, whereas the issue in the *Gardner* case was the withdrawal of nutrition and hydration, in this case Chad's body rejected the gastrostomy tube providing nutrition and hydration and the issue is whether to order reinsertion of a tube. On January 10, 1990,

the Superior Court (Androscoggin County, *Delahanty, J.*) found by clear and convincing evidence that Chad's expressions were made in a serious and deliberative manner and must be considered valid for the purposes of determining whether he made a competent decision not to be maintained by artificial means in his present tragic state. Further, the court found that Chad's parents as his court-appointed guardians (who have declared their intent to respect Chad's wishes) are the appropriate persons, in consultation with the attending physician, to determine whether artificial hydration and nutrition should be provided him. On the authority of *Gardner* we affirm.

The following facts found by the Superior Court in its order of January 10, 1990, are well supported by the record. On January 20, 1989, Chad Swan, a normally mature high school senior then 17⅓ years of age, suffered "severe facial injuries and a permanent and totally disabling head injury" in an auto accident. He was taken to Central Maine Medical Center (CMMC) in Lewiston and hospitalized in intensive care. "Chad has never regained consciousness or any voluntary bodily function since the accident. He is totally incapable of feeding himself or ingesting food and drink by normal means. He is unable to chew or swallow voluntarily, making it necessary for him to be tube fed." "Although Chad is not brain dead he is in a persistent vegetative state with virtually no hope of improvement or of regaining any form of cognitive function. Any physical movement or eye tracking is non-purposeful and he has no appropriate reaction to specific stimuli."

After the accident Chad was first fed and hydrated by a nasogastric tube, but because of multiple complications "a decision was made in late February to surgically implant a gastrostomy tube which continued to sustain him until December 30, 1989." During the week prior to December 30, however, Dr. Joel Franck, the experienced neurosurgeon attending Chad, noticed infection surrounding the entry point of the tube. On the 29th it became apparent that the tube was not properly allowing food to pass into Chad's stomach, and on the 30th it appeared that infection had closed over the hole and tract to the stomach. A specialist in gastroenterology consulted by Dr. Franck "found that the tube had eroded out of the stomach and abdominal walls and that the tissue as a normal bodily reaction had closed the feeding track [sic] and sealed off the tube so that it provided no hydration or nutrition and was of no benefit." Reinsertion of the tube was described by both physicians as "a major surgical procedure with attendant surgical risks heightened due to Chad's deterioration since the first tube was inserted." Further, such a procedure could not be undertaken until after the present infection cleared—estimated to take from two to four weeks after December 30. Use of a nasogastric tube also presented problems. Chad's severe facial injuries make insertion difficult, and he has "a strong gag reflex and has experienced grossly abnormal respiration." The nasogastric tube causes irritation, nasal passage erosion, and diarrhea. Further, "it frequently comes out of the stomach and on certain movements can be entirely pulled out. Many of these conditions led to the decision to change tubes last February."

In the circumstances, "Dr. Franck recommended that a new tube not be inserted, that Chad be given intramuscular medications for comfort and that he be allowed to die." Dr. Franck's views had the concurrence of Chad's parents, Frank and Linda Swan, whom the Androscoggin County Probate Court has appointed co-guardians and co-conservators of Chad shortly after his 18th birthday on September 8, 1989. "They do not wish to prolong Chad's deteriorating life and have specifically objected to any continuation of hydration and nutrition. They wish only that he be made comfortable without the appearance of pain or discomfort."

On September 5, 1989, Chad's parents, along with his only sibling, his older brother Scott, had joined in filing a complaint for declaratory judgment that the family, treating physicians, and employees of CMMC would incur no legal liability, civil or criminal, "for their participation in the

removal of all artificial hydration and nutrition for Chad Eric Swan." In affidavits supporting their complaint, Chad's mother and brother stated that Chad had made specific statements to them, prior to his accident, that he would not want to be kept alive by artificial means should injury render him incapable of existing otherwise. The District Attorney opposed the complaint. The Superior Court appointed a guardian ad litem for Chad,[1] and at the time Chad's body rejected the gastrostomy tube on December 30, 1989, the case was awaiting trial.

When Chad's body rejected the feeding tube, however, CMMC, "in a departure from its neutral position, requested [a] hearing to determine whether an interim order should be issued pending notice to all parties and an evidentiary hearing." [2] After the emergency December 30 hearing, the court (*Delahanty, J.*) issued a temporary order directing "that a central venous line be inserted to maintain hydration and medication." The court determined that "a central venous line was the least invasive procedure available; however, since it does not provide nutrition it is only viable as a temporary measure." On January 5, 1990, the court held a hearing to determine whether to issue an interlocutory order requiring the compulsory provision of nutrition and hydration to Chad. Having received evidence and heard the legal argument of counsel, the court on January 10, 1990, entered an order allowing the central venous hydration tube to be removed upon consent of Chad's guardians and further declaring that they, "in consultation with the attending physician, are the proper persons to determine whether additional hydration and nutrition ought to be provided" to Chad. The District Attorney immediately appealed, requesting that the court stay the part of its order allowing the central venous tube to be withdrawn. The guardian ad litem separately urged the court to stay its order and, in addition, to require the insertion of a feeding tube "to preserve the status quo" until the ultimate merits of the case could be decided. Although the court expressly found it unlikely that the District Attorney would be successful on appeal, the court, in recognition of the fact that Chad could die before an appeal could be heard, stayed its order and required that pending appeal Chad continue to receive hydration and medication through the central venous tube. From this ruling as entered on January 12, 1990, Chad's family appeals.[3]

This appeal is controlled by *In re Gardner*, 534 A.2d 947 (Me.1987), in which we held that "when an individual has clearly and convincingly in advance of treatment expressed his decision not to be maintained by life-sustaining procedures in a persistent vegetative state, health care professionals must respect that decision." *Id.* at 953. On appeal the District Attorney does not question the Superior Court's finding of fact that Chad is in a persistent vegetative state without hope of improvement. She contests, however, the court's second finding that Chad had clearly and convincingly in advance of treatment declared his decision not to be maintained in that condition by life-sustaining procedures. Her contest is grounded principally upon the fact that she had hoped to be able to adduce further evidence at a final hearing in the case and upon the argument that Chad's minority when he made his declarations concerning treatment reduced their legal significance.

We are not persuaded that there was any clear error in the Superior Court's second finding. At issue in the January 5, 1990, hearing was whether the court would order reinsertion of a feeding tube, raising the very questions and requiring the same factual findings as those on the ultimate merits of the case. The hearing took place a full four months after Chad's family had

---

1. On the merits of this appeal the guardian ad litem in general supports the position of the Swan family, as does the State Department of Human Services.

2. CMMC has otherwise adopted a neutral position in the controversy.

3. Two motions pending appeal were filed in the Law Court: the family's motion for relief from the stay and the guardian ad litem's motion for the resumption of nutrition. When we decided the appeal on January 23, 1990, those motions for interim relief became moot.

commenced the declaratory judgment action seeking to terminate his treatment without legal liability. On January 5, Chad's family gave extensive testimony about his pre-accident decision and the District Attorney was not limited in cross-examining the witnesses or in presenting contradictory evidence.

■ As already noted, Chad expressed his decision not to be artificially maintained at a time prior to when he turned 18, whereas the patient in *Gardner* had made his wishes known when he was about 21. We, however, do not find that the difference in the ages of the declarants of any significance in applying the principle enunciated in *Gardner*.[4] The record establishes by clear and convincing evidence that Chad expressed his desire on two separate occasions not to be artificially maintained in his current state. The first occasion took place during a discussion with his mother, Linda Swan, about the *Gardner* case. That case was highly publicized in the Lewiston area, and Joseph Gardner was the stepgrandson of a close friend of Chad's grandmother. Chad, then aged 16, and his mother "discussed what it meant to be a 'vegetable.' She explained that such a person needed total care in someone else's hands; and that someone must do everything for you. Chad wanted to know why they wouldn't let him [Joseph Gardner] die. His mother remembers him saying: 'If I can't be myself ... no way ... let me go to sleep.'"

The second occasion took place in January 1989, only eight days before Chad's accident when, with his older brother Scott, Chad visited Joey Rollins, one of Scott's friends who was comatose in a hospital after a car accident. "Chad saw Joey briefly, after which his brother Scott asked him if he saw Joey. Chad said 'I don't ever want to get like that.... I would want somebody to let me leave—to go in peace.'" Both of Chad's expressions were made in the context of serious discussions with family members about people Chad knew, whose plight he understood.

■ The fact that Chad made these declarations as to medical treatment before he reached the age of 18 is at most a factor to be considered by the factfinder in assessing the seriousness and deliberativeness with which his declarations were made. *See State v. Hussey*, 521 A.2d 278, 280 (Me. 1987) (minority of witness is a factor taken into account but not dispositive regarding the minor's competency to testify; common law presumption of competency for all persons 14 and older). It is well recognized that in all facets of life, "[a] minor acquires capacity to consent to different kinds of invasions and conduct at different stages of his development. Capacity exists when the minor has the ability of the average person to understand and weigh the risks and benefits." *Prosser and Keaton on Torts* § 18, at 115 (5th ed. 1984). *See also Restatement (Second) of Torts* § 892A, comment b (1979) ("If the person consenting is a child or one of deficient mental capacity, the consent may still be effective if he is capable of appreciating the nature, extent, and probable consequences of the conduct consented to"). We recognize this in the law of our own state in the different ages at which persons attain capacity to consent to adoption, operate a motor vehicle, purchase tobacco products, leave school, vote, marry, and purchase and drink alcoholic beverages.[5] *See also In re E.G., a Minor*, 133 Ill.2d 98, 139 Ill.Dec. 810, 549 N.E.2d 322 (Ill.1989) (a mature 17–year–old has a common law right to refuse medical treatment).

---

**4.** The other factual difference between this case and *Gardner*, i.e., that Chad's body naturally rejected the gastrostomy tube, does not detract at all from the binding authority of *Gardner* here.

**5.** *See* 17–A M.R.S.A. § 253(1)(B) (Supp.1989) (statutory rape only under age 14); 19 M.R.S.A. § 532 (1981) (consent to adoption at age 14); 29 M.R.S.A. § 538 (Supp.1989) (operation of a motor vehicle at age 16); 20–A M.R.S.A. § 5001–A(1) (Supp.1989) (leave school at age 17); 28–A M.R.S.A. § 704 (1988) (sell alcohol at age 17 if a supervisor 18 years old or older is present); 19 M.R.S.A. § 62(4) (Supp.1989) (marry without parental consent at age 18); 21–A M.R.S.A. § 111(2) (Supp.1989) (vote at age 18); 22 M.R.S.A. § 1579(1) (Supp.1989) (purchase tobacco products at age 18); 28–A M.R.S.A. § 354 (1988) (purchase alcohol at age 20).

■ In light of our ruling in *Gardner* and after careful analysis of the specific facts of the case at bar, the Superior Court committed no error in refusing to order the reinsertion of a feeding tube in these circumstances in which the patient, a normally mature high school senior, had expressed well-formed desires as to medical treatment to his family, who now urge that those desires be respected. As in *Gardner*, we rest our decision on Chad's own conclusion and not on any theory of substituted judgment. Once the Superior Court determined by clear and convincing evidence that Chad made a pre-accident decision with regard to his medical treatment in his present condition, "the court had no other course than to respect that personal decision and to authorize its effectuation." *Gardner*, 534 A.2d at 956. The court determined that Chad's parents, who are his natural and legal guardians and who wish to respect Chad's desires, as found by the court, "are the proper persons to determine whether additional hydration and nutrition ought to be provided to Chad." Chad's guardian ad litem and the Department of Human Services support this ruling. It is appropriate, then, to leave to the parents the effectuation of Chad's medical decision. In carrying out that decision, his parents should of course ensure that Chad receives the palliative care necessary to meet his needs for humane treatment.

The entry is:

Judgment of the Superior Court of January 10, 1990, affirmed. All orders pending appeal vacated.

McKUSICK, C.J., and WATHEN, GLASSMAN, HORNBY and COLLINS, JJ., concur.

CLIFFORD, Justice, with whom ROBERTS, J., joins, concurring.

The record supports the trial court's finding that Chad Swan is in a persistent vegetative state. Likewise, there is support in the record for the Superior Court's finding that Swan made several statements concerning refusal of treatment. Because the statements are similar to those held to be sufficient to require withdrawal of nutri-

tion and hydration in *In re Gardner*, 534 A.2d 947 (Me.1987), the result here is compelled by *Gardner*.