**GUARDIANSHIP OF Susan BOYLE.**

Supreme Judicial Court of Maine.

Argued June 5, 1995.
Decided March 25, 1996.

Helen M. Bailey (orally), Maine Advocacy Services, Augusta, for Appellant.

Margaret P. Shalhoob (orally), Bangor, Guardian Ad Litem.

Andrew Ketterer, Attorney General, Carmen L. Coulombe (orally), Assistant Attorney General, Augusta, for Appellees.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA and LIPEZ, JJ.

CLIFFORD, Justice.

These consolidated appeals arise from two separate petitions for guardianship of Susan Boyle. The Department of Human Services, Bureau of Elder and Adult Services (the Department) appeals from an April 15, 1994 judgment of the Penobscot County Probate Court (*Woodcock, J.*) denying its petition for guardianship of Susan. The Department

contends that the court erred in concluding that Susan was not an incapacitated person. Susan appeals a September 15, 1994 judgment by the same court that granted the Department's renewed petition for guardianship to the extent that it does not limit the guardianship by excluding the power to authorize the administration of psychotropic medication.

Susan Boyle is a forty-six-year-old woman who has suffered from mental illness for many years. She has been diagnosed as a paranoid schizophrenic. Susan has been hospitalized on an involuntary basis at the Bangor Mental Health Institute (BMHI) since November 1992 because of the likelihood that she was a danger to herself or others. *See* 34–B M.R.S.A. § 3864(6) (1988 & Supp. 1995).[1]

The Department filed a petition in July 1993 seeking to have itself appointed temporary guardian for Susan for the limited purpose of decision making. Susan moved to limit the guardianship to exclude the power to compel her to take antipsychotic drugs. On April 15, 1994, the court, without ruling on Susan's motion, denied the Department's petition, concluding that Susan was not an incapacitated person. The Department appeals that judgment.

In May 1994, the Department again filed a petition for guardianship of Susan based on Susan's asserted psychiatric deterioration that put her at the risk of assaultive behavior by other patients. Susan moved to limit guardianship to exclude powers relating to her mental and psychiatric treatment. The court concluded that Susan was an incapacitated person in need of a guardian, and granted the Department's petition. The

court denied Susan's motion. Susan's appeal of that judgment has been consolidated with the Department's appeal to facilitate review by this Court.

## I.

 The Department challenges the April decision of the Probate Court, contending that the court's finding that Susan was, at that time, an adult capable of giving informed consent and informed refusal to her medical and psychiatric treatment was error. We review factual decisions of the trial court for clear error. *Guardianship of Collier*, 653 A.2d 898, 900 (Me.1995). A factual determination is clearly erroneous only when there is no competent evidence in the record to support it. *Hamm v. Hamm*, 584 A.2d 59, 62 (Me.1990). It is primarily for the factfinder to assess the credibility of witnesses and to consider the weight and significance of the evidence. *Tonge v. Waterville Realty Corp.*, 448 A.2d 902, 905 (Me.1982).

 The burden of proof at the hearing was on the Department. Although there was significant evidence that would support a finding that Susan was incapacitated at that time, such a finding is not compelled because there is competent evidence to support the findings of the Probate Court. Accordingly, we must affirm the court's April decision.

## II.

Even though Susan has been treated with psychotropic drugs in the past and has responded well to them, she has refused to take such medication voluntarily since 1985. She contends that her decision to refuse psychotropic medication, made while she was

---

1. 34–B M.R.S.A. § 3864(6)(A) & (B) (1988 & Supp.1995) provides:

 **Court findings.** Procedures dealing with the District Court's findings under this section are as follows.
 A. The District Court shall so state in the record, if it finds upon completion of the hearing and consideration of the record:
 (1) Clear and convincing evidence that the person is mentally ill and that the person's recent actions and behavior demonstrate that the person's illness poses a likelihood of serious harm;

 (2) That inpatient hospitalization is the best available means for treatment of the patient; and
 (3) That it is satisfied with the individual treatment plan offered by the hospital to which the applicant seeks the patient's involuntary commitment.
 B. If the District Court makes the findings described in paragraph A, subparagraphs 1 and 2, but is not satisfied with the individual treatment plan as offered, it may continue the case for not longer than 10 days, pending reconsideration and resubmission of an individual treatment plan by the hospital.

determined to be competent, survives her subsequent incapacity and precludes the appointment of a guardian specifically empowered to authorize the administration of any such drugs. She argues that the court erred in its September decision granting the Department's petition.

It is undisputed that Susan is incapacitated within the meaning of 18–A M.R.S.A. § 5–101(1) (1981) [2] and in need of continuing care and supervision, thus meeting the statutory criteria for the appointment of a guardian with limited powers. 18–A M.R.S.A. § 5–304(b) (Supp.1995).[3] The Department was appointed as Susan's limited guardian pursuant to 18–A M.R.S.A. § 5–601(a).[4]

Section 5–304(a) requires the Probate Court to exercise its power of appointment "to encourage the development of maximum self reliance and independence of the incapacitated person and make appointive and other orders only to the extent necessitated by the incapacitated person's actual mental and adaptive limitations or other conditions warranting the procedure." This is precisely what the court did in the instant case. The Department's powers are limited to administering medical and psychological care and treatment, including the power to administer psychotropic medication, if that treatment is necessary.

The evidence in this case discloses the necessity of medical and psychological treatment to protect Susan from danger to herself and others, and that the treatment is essential for her to be self-reliant and independent. If antipsychotic medication is indicated but is not administered to Susan, she is not amenable to any other treatment; her condition will deteriorate. Currently, she is delusional, thinks others wish to harm her, cannot control her temper, and lacks the judgment to protect herself from assaults. The danger to herself and others, first determined to exist when she was involuntarily committed to BMHI, will only increase the longer Susan goes without the necessary administration of psychotropic drugs. Without the properly administered medication, she will be condemned to a life of complete dependency spent in an institution. With the properly administered medication, Susan can benefit from psychotherapy, occupational and recreational therapies and other treatments, and has a reasonable chance to lead a relatively normal and independent life.

■ Susan contends that her previously expressed wish that she does not want antipsychotic medications precludes the action of the Probate Court from granting to the Department the authority to administer them. She relies on the right to personal autonomy and self-determination expressed in *In re Gardner*, 534 A.2d 947 (Me.1987), in support of her position. We are unpersuaded by her contention. The right of personal autonomy recognized in *Gardner* and *In re Swan*, 569 A.2d 1202 (Me.1990), is not absolute and does not operate to prevent the State in a case such as this from acting to protect Susan from doing harm to herself and others.

*Gardner* and *Swan* recognize that the previously and clearly expressed wishes of a person in a permanent and irreversible vegetative state, with no hope of recovery, without control over bodily functions, and with no thought process or emotion, may serve to terminate life-sustaining medical treatment. *Gardner*, 534 A.2d at 954; *Swan*, 569 A.2d at

**2.** 18–A M.R.S.A. § 5–101(1) (1981) provides:

(1) "Incapacitated person" means any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, or other cause except minority to the extent that he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person[.]

**3.** 18–A M.R.S.A. § 5–304(b) (Supp.1995) provides in pertinent part:

(b) The court may appoint a guardian as requested if it is satisfied that the person for whom a guardian is sought is incapacitated, that the appointment is necessary or desirable as a means of providing continuing care and supervision of the person of the incapacitated person. . . .

**4.** 18–A M.R.S.A. § 5–601(a) (1981) provides:

(a) In any case in which a guardian or conservator may be appointed by the court under this Article, the court may appoint a public guardian or conservator as provided in this Part for persons who are mentally retarded and for incapacitated persons as defined in section 5–101, paragraph (1), who are in need of protective services.

1206. In both cases, the result reached by the court was concurred in by the family, the guardian, and the Department. *Gardner* and *Swan* do not speak to the circumstances present in this case. In the case before us, Susan has been involuntarily committed to a mental hospital because she presents a danger to herself and others, and the administration of psychotropic drugs may be the only treatment that can dramatically reduce that danger.

It is significant that the Legislature has not acted to restrict the authority of a guardian beyond the unique circumstances of *Gardner* and *Swan*. In 1991, the Legislature amended 18–A M.R.S.A. to codify the holdings in *Gardner* and *Swan*. The authority of guardians to authorize or withhold medical treatment is now limited only in the case of a ward who is terminally ill or in a persistent vegetative state and has directed otherwise in a living will. P.L.1991, ch. 719, § 2. It is especially noteworthy, however, that when the Legislature addressed medical treatment to be given to a person with a psychotic disorder, including antipsychotic drugs, by enacting 34–B M.R.S.A. § 11001 (Supp. 1995),[5] it did not further amend 18–A M.R.S.A. § 5–312(a)(3) to limit the authority of a guardian with respect to medical treatment. Rather, with the exception of a ward who is terminally ill or in a persistent vegetative state (Susan is neither), the Legislature maintained in the guardian the same power to authorize medical treatment as needed for an incapacitated person as for a minor child.

The State's interest in protecting its citizens from dangerous circumstances is substantial. The Adult Protective Services Act, 22 M.R.S.A. §§ 3470–3492 (1992 & Supp. 1995), recognizes the inability of certain of our adult population to manage their own affairs or to protect themselves from abuse, neglect, or physical danger due to an incapacity or physical disability. *Id.* § 3471. The Act authorizes the Department to act to protect "incapacitated and dependent adults

in circumstances which present a substantial risk of abuse, neglect, or exploitation," including petitioning for guardianship. *Id.* §§ 3473(1)(A), 3482. The guardian of an incapacitated person has the same powers that "a parent has respecting [the parent's] unemancipated minor child," unless modified by court order. 18–A M.R.S.A. § 5–312(a). This authority includes the giving or withholding of consent or approval related to medical care. *Id.* § 5–312(a)(3).

Susan has been committed involuntarily to an institution because it has been determined that she is a danger to herself and others. 34–B M.R.S.A. § 3864(6). Because she is delusional, thinks others want to harm her, and is unable to protect herself from assault, the danger to Susan so long as she remains untreated with antipsychotic medication as that treatment is indicated is real and substantial. The court properly declined to completely withhold from the Department the power to authorize, when appropriate, the treatment of Susan with psychotropic drugs essential to protect her from harm to herself and others. Its decision is consistent with the policy expressed in the statute of encouraging the development of maximum self reliance and independence. 18–A M.R.S.A. § 5–304(a).

The entry is:

Judgment of April 15, 1994 affirmed.

Judgment of September 15, 1994 affirmed.

LIPEZ, Justice, with whom GLASSMAN, Justice, and RUDMAN, Justice join, dissenting.

I must respectfully dissent from the Court's opinion. In reaching its September decision to appoint a guardian with the authority to authorize the treatment of Susan Boyle with psychotropic medication, the Probate Court failed to give proper consideration to her competently expressed preincapacity desire, affirmed in the Probate Court's April decision, to forego treatment with such

---

5. 34–B M.R.S.A. § 11001(2) (Supp.1995) allows a person with a psychotic disorder, in a written declaration made while competent and in a state of remission, to provide for medical treatment to be administered to them on a subsequent lapse into a psychotic condition. No such written dec-

laration was made here. Section 11001(17) provides that in the absence of a written declaration, ordinary standards of current medical practice must be followed. That section also allows the treating physician to consider verbal statements of the patient.

medication.[1] This omission was an error of law.

"The right of a person to control his own body is a basic societal concept, long recognized in the common law." *In re Conroy*, 98 N.J. 321, 486 A.2d 1209, 1221 (1985). As we have acknowledged:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*In re Gardner*, 534 A.2d 947, 950 (Me.1987) (citing *Union Pacific Ry. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891)). As Justice Cardozo observed, "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body...." *Schloendorff v. Society of New York Hosp.*, 211 N.Y. 125, 105 N.E. 92, 93 (1914).

These concerns for personal autonomy have received careful attention from the courts in the area of medical care.

> In our system of a free government, where notions of individual autonomy and free choice are cherished, it is the individual who must have the final say in respect to decisions regarding his medical treatment in order to insure the greatest possible protection is accorded his autonomy and freedom from unwanted interference with the furtherance of his own desires. This right extends equally to mentally ill persons who are not to be treated as persons of lesser status or dignity because of their illness.

*Rivers v. Katz*, 67 N.Y.2d 485, 504 N.Y.S.2d 74, 78, 495 N.E.2d 337, 341 (1986) (citations omitted), *reargument denied*, 68 N.Y.2d 808, 506 N.Y.S.2d 1039, 498 N.E.2d 438 (1986).

"Medical choices are private.... They are not to be decided by societal standards of reasonableness or normalcy. Rather, it is the patient's preferences-formed by his or her unique personal experiences-that should control." *In re Peter*, 108 N.J. 365, 529 A.2d 419, 423 (1987). "[E]very competent adult has the right to forego treatment, or even cure, if it entails what for him are intolerable consequences or risks, however unwise his sense of values may be to others." *Downer v. Veilleux*, 322 A.2d 82, 91 (Me.1974). "The law protects [a person's] right to make [her] own decision to accept or reject treatment, whether that decision is wise or unwise." *Brophy v. New England Sinai Hosp., Inc.*, 398 Mass. 417, 497 N.E.2d 626, 633 (1986) (citing *Lane v. Candura*, 6 Mass.App.Ct. 377, 376 N.E.2d 1232 (1978)). "[I]f the patient's right to informed consent is to have any meaning at all, it must be accorded respect even when it conflicts with the advice of the doctor or the values of the medical profession as a whole." *Conroy*, 486 A.2d at 1225.

Applying the doctrine of informed consent, we have recognized that a competent preincapacity refusal of treatment may be binding during subsequent incapacity. *See, e.g., In re Swan*, 569 A.2d 1202 (Me.1990); *Gardner*, 534 A.2d 947. In *Gardner*, the issue was whether the competent preincapacity decision to forego life-sustaining treatment was controlling when the individual was subsequently incapacitated. We held that an individual has a right to refuse life-sustaining treatment and that a clearly expressed decision on the matter was binding during subsequent incapacity. *Gardner*, 534 A.2d at 952. In so doing, we respected the individual's personal decision not to be kept alive in a persistent vegetative state. *Id.* We later extended this right to a minor who, prior to incapacity, competently expressed his desire

---

**1.** In its April decision the Probate Court made the following findings:

4. Susan Boyle has informed consent.
5. Susan Boyle does not wish to have medical decisions made for her.
6. Susan Boyle does not wish to be required to take psychotropic medications.
7. Susan Boyle is not a risk to herself or others.

8. Petitioner has failed to meet its burden of establishing by a preponderance of the evidence that Susan Boyle is unable to make or communicate responsible decisions concerning her person.
9. Susan Boyle is not an incapacitated person.

to forego treatment. *Swan,* 569 A.2d at 1206.

I discern nothing in the underlying principles of either *Gardner* or *Swan* to suggest that a distinction must be drawn between cases involving preincapacity decisions to refuse life-sustaining medical treatment, where the individual is subsequently incapacitated and in a persistent vegetative state, and the instant case involving a preincapacity decision to refuse treatment with antipsychotic drugs. While competent, Boyle clearly expressed her wishes to avoid treatment, as did the patients in *Gardner* and *Swan.* The same right to control one's own body is at stake in *Gardner,* in *Swan,* and in the instant case.[2] To argue, as DHS does, that Boyle could be helped by the treatment that she has steadfastly refused, while the patients in *Gardner* and *Swan* could not have been, ignores the critical point that Boyle has already competently determined what treatment is in her best interests. She had taken psychotropic drugs before and had complained of side effects. She had been informed that she could suffer a relapse without the medication. Despite the fact that the medication helped her to function better, she refused it. Boyle knew the possible consequences of refusing the medication.

Boyle has a strong interest in remaining free from the medications she fears. *See Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417, 424 (1977) (recognizing strong interest in avoiding non-consensual bodily invasions). "We can identify few legitimate medical procedures which are more intrusive than the forcible injection of antipsychotic medication." *In re Guardianship of Roe,* 383 Mass. 415, 421 N.E.2d 40, 52 (1981). Although psychotropic drugs are effective in reducing thought disorder and may benefit the patient by allowing her to participate in other types of treatment, the drugs also may have serious short term side-effects, including blurred vision, dry mouth and throat, constipation, diarrhea, dizziness, slowing of the thought processes, weight gain, loss of sexual desire, akathesia (inability to stay still), and Parkinsonisms (drooling, muscle stiffness, rigidity, shuffling gait, tremors).[3] *In re Boyd,* 403 A.2d 744, 752 n. 13 (D.C. 1979). Neuroleptic malignant syndrome also may develop as a side effect, in the form of fever, skeletal rigidity, tachycardia, and alterations in consciousness including delirium, mutism, stupor and coma. *In re C.E.,* 161 Ill.2d 200, 204 Ill.Dec. 121, 128, 641 N.E.2d 345, 352 (1994), *cert. denied,* — U.S. —, 115 S.Ct. 1956, 131 L.Ed.2d 848 (1995).

Tardive dyskinesia is a potentially permanent side effect of antipsychotic medication. It is a syndrome characterized by "involuntary movements of the tongue, face, mouth, lips, or jaw. Additionally, ulcerations of the mouth may occur, speech may become incomprehensible, and, in extreme situations, swallowing and breathing may become difficult." *Boyd,* 403 A.2d at 752.

These side-effects, especially tardive dyskinesia, are serious, as is the degree of bodily invasion involved in forcible medication.[4]

---

**2.** Cases involving refusal of life-sustaining treatment and cases involving refusal of psychotropic drugs cite each other interchangeably. *See, e.g., Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (review of state law regarding withdrawal of life-sustaining nutrition and hydration citing *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)) and *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (cases involving administration of psychotropic drugs); *In re Boyd,* 403 A.2d 744 (D.C.App.1979) (considering whether First Amendment claims in opposition to forced administration of psychotropic drugs survive incompetency and adopting *substituted judgment* standard developed in *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977)

(case involving withholding of chemotherapy from profoundly mentally retarded individual)).

**3.** Patients often refuse these drugs because of side-effects which go unnoticed by their physician. *Davis v. Hubbard,* 506 F.Supp. 915, 936 n. 28 (N.D.Ohio 1980) (citing Van Putten, *Why do Schizophrenic Patients Refuse to Take Their Drugs?* 31 Arch.Gen. Psychiatry 67, 70–71 (1974)).

**4.** Forcible administration of psychotropic drugs diminishes their effectiveness. "[P]sychotropic drugs are less efficacious in a hostile or negative environment. As a corollary to this, even if the best drug is prescribed, if the patient is unwilling to accept it, the positive effects are greatly lessened, especially in terms of long range benefits." *Davis,* 506 F.Supp. at 936 (citing *Rennie v. Klein,* 462 F.Supp. 1131, 1141 (D.N.J.1978)).

"[Psychotropic drugs] quite often cause pain and serious, long-term, if not permanent, side effects. They deaden the patient's ability to think and their forced administration is an affront to basic concepts of human dignity." *Davis v. Hubbard,* 506 F.Supp. 915, 936 (N.D.Ohio 1980).

Despite the potentially severe side effects associated with the administration of psychotropic drugs, Boyle's right to refuse them is qualified. *Gardner,* 534 A.2d at 955; *accord In re Storar,* 52 N.Y.2d 363, 438 N.Y.S.2d 266, 273, 420 N.E.2d 64, 71 (1981), *cert. denied,* 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981) ("We recognize that under certain circumstances the common-law right [to decline medical treatment] may have to yield to superior State interests, as it would even if it were constitutionally based."). Although the Court cites a number of statutes and state interests that, in its view, overcome Boyle's right to decline treatment, none of those justifications withstand scrutiny.

In discussing the scope of a guardian's authority to authorize or withhold medical treatment, the Court finds it "significant" that when the Legislature amended 18–A M.R.S.A. § 5–312 after the *Gardner* decision, it explicitly limited the guardian's authority only in situations where a ward who is terminally ill or in a persistent vegetative state has left a living will. This statute provided in relevant part:

A guardian may give or withhold consents or approvals related to medical or other professional care, counsel, treatment or service for the ward. The guardian is empowered to withhold or withdraw life-sustaining treatment when the ward is in a terminal condition or persistent vegetative state as defined in section 5–701 with respect to qualified patients *provided, however, that the guardian shall honor any effective living will declaration executed by the ward pursuant to section 5–702.*

18–A M.R.S.A. § 5–312(a)(3) (Supp.1994), *amended by* P.L.1995, ch. 378, § B–2, (emphasis added).[5] On the basis of this language, the Court concludes that a guardian's authority to authorize or withhold medical treatment is virtually absolute, subject only to the provisions of a preexisting living will.

This view is insupportable. The amendment to section 5–312(a)(3) was companion legislation to the Uniform Rights of the Terminally Ill Act, 18–A M.R.S.A. §§ 5–701—5–714 (Supp.1994), *repealed* by P.L.1995, ch. 378, § B–4. *See* Comm.Amend. A to L.D. 1857, No. H–964 (115th Legis.1991). The legislative history of that statute makes clear that its purpose was the narrow one of authorizing the use of living wills by the citizens of Maine:

The scope of the Act is narrow. Its impact is limited to treatment that is merely life-prolonging, and to patients whose terminal condition is incurable and irreversible, whose death will soon occur, and who are unable to participate in treatment decisions. *Beyond its narrow scope, the Act is not intended to affect any existing rights and responsibilities of persons to make medical treatment decisions.* The Act merely provides alternative ways in which a terminally ill patient's desires regarding the use of life-sustaining procedures can be legally implemented.

Comm.Amend. A to L.D. 2074, No. H–1059 (114th Legis.1990) (emphasis added).

This language leaves no doubt that the Uniform Rights for the Terminally Ill Act, and the companion amendment to section 5–312(a)(3), do not preclude the further common law elaboration of the doctrine of informed consent as it applies to refusals to accept medication. Section 5–312(a)(3) does not represent the *exclusive* limitation on a guardian's authority to make medical treatment decisions on behalf of a ward. Rather, section 5–312(a)(3) contains a statutory limitation on that authority that must be read in conjunction with common law limitations, including the doctrine of informed consent applicable in this case.

The Court makes a similar mistake in finding it "especially noteworthy" that when the Legislature addressed medical treatment to be given to a person with a psychotic disorder by enacting the Medical Treatment of

---

**5.** Section 5–312(a)(3) was amended again in 1995. In this case, however, we need only be concerned with section 5–312(a)(3) as it existed at the time the present dispute arose.

Psychotic Disorders Act, 34–B M.R.S.A. § 11001 (Supp.1995), it did not further amend 18–A M.R.S.A. § 5–312(a)(3) to limit the authority of a guardian with respect to medical treatment involving psychotropic medication. Again, the Court erroneously transforms a procedural alternative (a written declaration) for directing treatment with psychotropic drugs during a period of incompetence into an exclusive method which precludes further common law elaboration of the doctrine of informed consent. There is nothing in the language of the Act that permits this conclusion. Indeed, the Act itself permits a treating physician to consider verbal statements of the patient (though under circumstances not present here). To the extent that the Act permits an individual to direct treatment of psychotic disorders even after the onset of incompetency, the Act demonstrates the Legislature's recognition of the importance of respecting an individual's medical treatment decisions and supports the position of this dissent. Moreover, there is a noteworthy irony in the Court's refusal to honor Susan Boyle's competently expressed declaration in a court proceeding that she does not want psychotropic medication in the face of a statute that respects the integrity of a comparable extra-judicial declaration.

The Court also misreads 18–A M.R.S.A. § 5–304(a) (Supp.1995). That provision provides:

> The court shall exercise the authority conferred in Parts 3 [6] and 6 [7] so as to encourage the development of maximum self reliance and independence of the incapacitated person and make appointive and other orders *only to the extent necessitated by the incapacitated person's actual mental and adaptive limitations or other conditions warranting the procedure.*

**6.** This is a reference to 18–A M.R.S.A. § 5–301 (1981), which governs testamentary appointments of guardians for incapacitated persons.

**7.** This is a reference to 18–A M.R.S.A. § 5–601 (1981), which governs appointment of public guardians and conservators in cases in which a guardian is appointed for mentally retarded and incapacitated persons.

**8.** The Probate Code defines incapacity as follows:

(emphasis added). In concluding that this provision "requires the Probate Court to exercise its power of appointment" to encourage the development of maximum self reliance and independence, the Court confuses an obligation with a purpose. Properly read, the provision means that *when* the court exercises the authority conferred in parts 3 and 6, the court is to exercise that authority for the purpose of encouraging the development of maximum self reliance and independence of the incapacitated person. The court is to exercise its authority "only to the extent necessitated by the incapacitated person's actual mental and adaptive limitations or other conditions warranting the procedure." Necessity is measured by the incapacitated person's limitations. Given Boyle's preincapacity refusal to take psychotropic medication, it was not necessary to appoint a guardian to make such decisions for her.

The Court offers this further justification for its decision: "Susan has been involuntarily committed to a mental hospital because she presents a danger to herself and others, and the administration of psychotropic drugs is the only treatment that can dramatically reduce that danger." The fact of involuntary commitment adds nothing to the State's case. Indeed, the State does not argue to the contrary, knowing that Boyle's inability to function outside of the institution without being a danger to herself or others does not mean that she can be forced to accept a form of medical treatment within the institution that she competently rejects. Mental illness requiring involuntary commitment does not necessarily mean that a person is incapacitated within the meaning of the Probate Code.[8]

Moreover, the record reveals that measures can be taken within the institution, short of forced medication, to protect Boyle from herself and others. Despite her threat-

> [a] person who is impaired by reason of mental illness, mental deficiency ... or other cause except minority to the extent that he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person ...

18–A M.R.S.A. § 5–101 (1981). In its April decision the Probate Court found that Boyle had sufficient understanding and capacity to communicate a decision to refuse to take psychotropic medication.

ening behavior towards other patients, and the threatening behavior of other patients towards her, the caregivers have at all times been able to protect Boyle and the other patients through intervention and separation. Her erratic attention to personal hygiene and to her physical health are also manageable through intervention and supervision. A dietician works with her to ensure a healthy diet, and there is no evidence that she is malnourished. She allows an internist to treat her on a limited basis for a pre-existing bowel condition. Because these problems are clearly manageable within the institutional setting without resort to treatment with psychotropic medication, they do not pose the risk of danger to Boyle or others that justifies disregarding Boyle's competently expressed desire to be free of psychotropic medication.

The Court also asserts that "[w]ithout the medication, [Boyle] will be condemned to a life of complete dependency spent in an institution." Although the word "condemned" reflects a value judgment inappropriate to the analysis, the record supports the conclusion that Boyle cannot function outside of the institution without medication. The Court further states that "[w]ith the medication, Susan can benefit from psychotherapy, occupational and recreational therapies, and other treatments, and has a reasonable chance to lead a relatively normal and independent life." This sunny forecast is at odds with much of Boyle's history, and it ignores the side effects of medication Boyle so fears.[9] More importantly, Boyle has a different view of what is best for her. A psychiatric social worker testified at the August hearing that Boyle has clearly expressed a desire *not* to be discharged from BMHI. Her supervising psychiatrist testified that Boyle was ambivalent about being discharged from BMHI.[10] According to the Probate Court's findings of fact in its April decision, Boyle took into account the possibility of a relapse if she stopped taking medication. Boyle knew that her refusal to take medication might mean the life of institutional dependency the Court condemns.

In the final analysis, this case is a contest between competing views of where Susan Boyle will have a better life. She made the competent decision that she would have a better life free of the medication she fears even if that decision means a life inside an institution. The State insists that she should be forced to take the medication so she can enjoy a better life outside of the institution. This position elevates deinstitutionalization to a state interest of exaggerated import and diminishes Boyle's right to be free of unwanted medical treatment that poses known risks of dangerous side effects. By embracing this position, the Court forgets our teaching in *Gardner:* "[T]he greater risk of abuse lies in disregarding such specifically declared personal decisions and in imposing ... [treatment] upon the patient contrary to [her] expressed will." *Gardner,* 534 A.2d at 947; *cf. Saikewicz,* 370 N.E.2d at 426 ("The value of life as so perceived is lessened not by a decision to refuse treatment, but by the failure to allow a competent human being the

9. Susan Boyle grew up in Bangor, attended local schools, graduated from high school in 1968 and attended the University of Maine in Orono for two years. She had two children, suffered symptoms of mental illness after their birth, found herself unable to care for the children, and eventually had to give the children up for adoption. She moved to the Boston area in the early 1970's. From 1979 through 1987 she received mental health services in the Boston area consisting of short inpatient stays and outpatient treatment, including day hospitalization. She was prescribed medications for treatment of a mental illness. She discontinued taking the medications a year prior to her last reported visit to a Boston area mental health service in 1987. She was complaining at that time of the side effects of the medication. In late 1987 or early 1988, she returned to her father's home in Bangor and resided there until her admission to the Bangor Mental Health Institute on November 22, 1993, shortly after her father's death. Although there is evidence in the record that Boyle functioned more normally when taking her medications, and relapsed when she stopped taking the medication, it is difficult to assess the normalcy and independence of her life on medications since she has used them so erratically. The record is clear that Boyle's complaints about the side effects of the medication have been long standing.

10. The psychiatrist also testified that no outside program could provide Boyle with the level of supervision that she currently needs.

right of choice.").[11]

A decision to respect Boyle's previous decision to forego treatment with psychotropic medication would not mean that she could not benefit from future pharmacological advances that create a psychotropic drug effective for her without the side effects she fears. Boyle could not make an informed decision to refuse medication she knew nothing about. In considering whether her previous determination was binding as to new medications that become available, a court would have to decide the matter in light of the new facts. The department presented no evidence that such a drug was available.[12]

For the foregoing reasons, I would vacate the Probate Court's September decision.

---

11. Some might argue that the high cost of institutionalization is another state interest worthy of consideration in this case. To its credit, the State makes no such argument.

12. Although the issue of emergency treatment for Boyle is not before us, a decision favorable to Boyle would not preclude treatment for a patient such as Boyle in emergency situations. The provisions of 34–B M.R.S.A. § 3003 (1988 & Supp.1994) and Part B(IV)(H) of the Rights of Recipients of Mental Health Services regulations govern such determinations. An emergency is defined as a situation where, as a result of a re-cipient's behavior due to mental illness, there exists an imminent danger of bodily injury to the recipient or others. Rights Regulations Part B(IV)(H). When a licensed physician declares, in accordance with the appropriate Rights regulations, that an emergency situation exists, treatment may be administered over the recipient's objection and without her informed consent. Rights Regulations Part B(IV)(H)(2)(4). Treatment following a declaration of emergency may continue for no more than 72 consecutive hours. Rights Regulations Part B(IV)(H)(4).