Matter of Lyle A. (2006 NY Slip Op 26532)

Matter of Lyle A.

2006 NY Slip Op 26532 [14 Misc 3d 842]

December 19, 2006

O'Connor, J.

Family Court, Monroe County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, March 28, 2007

[*1]
In the Matter of Lyle A., a Child Alleged to be Abused and Neglected. Linda R., Respondent.
Family Court, Monroe County, December 19, 2006

APPEARANCES OF COUNSEL

Daniel M. DeLaus, Jr., County Attorney (Richard C. Roxin of counsel), for Monroe County Department of Human Services, petitioner. Lori Robb Managhan for respondent. Patricia A. Gibbons, Law Guardian.

OPINION OF THE COURT

Marilyn L. O'Connor, J.
The Monroe County Department of Human Services filed a permanency hearing report regarding Lyle (date of birth 2001) verified March 29, 2006 and requiring a permanency hearing. The report indicates Lyle was not in a preadoptive home and the goal was return to parent. An issue arose regarding the procedures used by the Department when it put Lyle on the psychotropic medication Depakote Sprinkles for mental illness and behavioral problems in or about March 2006. The little boy was only 4½ years old at the time, and had been in several foster care homes and sexually abused in one of them. A hearing was held June 26 and July 10, 2006, in which the issues were: (1) whether the Department's procedures and policies regarding the administration of the drug were sufficient, and (2) if sufficient, whether they were followed. Whether or not the medication had benefits making it the best treatment for Lyle, or even a reasonable treatment for him, was not intended to be decided as a result of this hearing, and is not decided here. This case is about important procedural issues and the rights of parents and [*2]children. For the reasons set forth below, the court finds that the Department's procedures for obtaining parental consent for the administration of psychotropic drugs to foster care children, and for responding to a parental request to withdraw consent, were legally insufficient. Whether or not the Department's existing insufficient procedures were followed is therefore a moot point.

Factual Background

Lyle and his two younger siblings went into foster care on or about August 23, 2005 due to the respondent mother's neglect.[FN1]

The mother herein, on October 25, 2005, signed the general medical authorization form which parents in neglect cases routinely sign for the Department of Human Services. Its relevant portion states,
"I hereby grant permission to the Monroe County Department of Human Services . . . and any other health care provider approved by the Monroe County Department of Human services, on behalf of my child, Lyle (DOB 2001), to provide and/or obtain any necessary: . . . Referrals, evaluations, consultations and/or treatment for identified behavior and emotional problems (this does not include the prescription of medication for these issues, which requires a separate consent)." (Emphasis added.)
The uncontradicted testimony about Lyle's condition at the time of his removal from his mother's care was that he seemed fine, was loving, nurturing, respectful and well mannered, though disappointed in his mother. Unfortunately, he was already parentified (he tried to cook for and care for his siblings), and he had already been sexually abused by persons responsible for his care and physically abused by another adult. When he entered foster care he was terrified of taking a bath—he screamed that he could not breathe. He suffered from ringworm, an infected ingrown toenail, and anemia. He was afraid to go alone into a bathroom. By August 31, 2005, he had been observed drinking out of a toilet, eating paper, and digging in the garbage. He had been referred to Mt. Hope Family Center on or before October 25, 2005 for counseling.
Neglect by his mother resulted in Lyle's removal into foster care. Unfortunately more neglect occurred while he was in foster care.[FN2] 

On November 14, 2005, Lyle disclosed sexual abuse involving other children in his first foster home. It had been reported on November 13, 2005. The Department records, in an Office of Children and Family Services, Child Protective Services intake report, indicate the abuse involved a teenage boy sexually abusing a boy half his age and that boy having sex with another grade school child in front of the older boy. The intake report also stated that the foster parents did nothing to protect the children, even after knowing about the sexual behavior. Apparently those three children directly involved were removed from that home, but the little boy Lyle at issue here—and his siblings—were not. This was despite the fact of Lyle's known history as a sexual and physical abuse victim. It is extremely unfortunate that he was not promptly removed from that home where he could not count on the foster parents to protect him or even to report current sex abuse [*3]despite being mandated reporters.[FN3]

Despite all this, an undated report from the caseworker, which by its content was probably made on or after November 16, 2005, states that "Lyle is an extremely smart little boy who loves school. He does well with a strong male role model. . . . Lyle is a wonderful little boy[,] is very affectionate and needs physical and emotional displays of love." He was also referred to the Catholic Family Center Sexual Abuse Treatment Program on December 15, 2005.
According to his mother's testimony, Lyle's acting out behavior became apparent to her when he broke down during a visitation in December 2005, crawled under the table at Strong Museum, and started crying loudly. After a while, his mother said she was able to take him aside and get him to talk. She testified he acted afraid to tell her, and begged her not to tell the caseworker, then indicated he was being sexually abused at the foster care home. For whatever reason, this incident is not contained in the detailed Department progress notes for any date. Indeed, the progress notes virtually ignore the apparent fact that Lyle was sexually abused in foster care. The notes do indicate, without explanation, that he and his siblings were moved to a new foster care home on or about December 27, 2005.
The respondent mother described her son as far more aggressive on the next visit after the Strong Museum incident. She testified that the caseworker said he had been acting out in the new foster care home, hit his siblings, and was disobedient on January 8, 2006. The Department then stopped the children's visits with the maternal grandmother and aunt. According to respondent mother, this was done because the maternal grandmother had more authority, and that is where Lyle "got structure." The respondent mother asked that the maternal grandmother be able to see Lyle, believing she might be able to straighten him out. She said she was told that was "not possible." Two weeks later the respondent mother said she was told her son was in sex abuse counseling.
By six months after entering foster care, Lyle had resided in at least two different foster homes (plus perhaps an emergency foster care home), had been sexually abused in the earlier of the two long-term foster care homes, was diagnosed with post-traumatic stress disorder (PTSD)[FN4]

and explosive disorder, and his behaviors ranged from banging his head on the floor to inappropriate behavior including suicidal ideation and actions that could result in harm to himself or others. In February, according to the respondent mother, the caseworker thought that the situation was life threatening, and she wanted to put 4½-year-old Lyle on Depakote Sprinkles, generically known as valproic acid. This is a psychotropic drug. Pursuant to Public Health Law § 2504 (2), a parent has the right to consent to medical treatment of his or her child. Under the Department's procedures, putting a child on such medication requires parental consent—or [*4]administrative consent as a substitution for actual parental consent—before it can be administered.[FN5]

Consent Process Background

Depakote Sprinkles were prescribed for Lyle by the physician who is the head of the Monroe County Foster Care Clinic. The caseworker presented the mother with a consent form, already signed by the clinic doctor, with a place for the mother and caseworker to also sign. The doctor's testimony established that she had seen Lyle four times before prescribing Depakote Sprinkles. First, she saw him briefly on September 5, 2005, when he was already in the foster care home where he was later determined to have been sexually abused. He was described as being in a state of shock. Twice more in that year she saw him with others present. Once again she saw him on February 6, 2006, when his mood changed rapidly. When making her recommendation for Depakote Sprinkles, the doctor relied on information from other observers (the foster care mother, day care provider, nurses, etc.). It is undisputed that the doctor did not talk with the boy's mother directly about the Depakote Sprinkles, but gave the caseworker a consent form on February 14, 2006 for the mother's signature and a page of information about Depakote Sprinkles. A psychiatric appointment had been scheduled for Lyle, but would not be conducted until early July.
The caseworker presented the mother with the consent form on February 16, 2006. The mother says she did not receive an information sheet about the drug—only oral information. It is undisputed that the mother said she thought her son did not need medication. The caseworker allegedly told her that he would probably go to a "residential facility" (i.e., an institutional placement instead of an individual foster care home), if he did not go on the medication. The respondent mother did not want him there, saying "I know what they do there." There is a dispute about whether the caseworker used Hillside residential as a coercive threat or as the probable realistic alternative if consent to medicate was not given. Whatever the intent, and whatever the perception, Hillside—or at least similar residential placement—was discussed. The mother said she wanted Lyle in a therapeutic foster care home as an alternative. She also said she was "hurt" by all this, and did not sign the consent form. Then she took the form and said she would talk to some doctors and get back to the caseworker.
The boy's mother testified she thereafter spoke with Lyle's prior pediatrician for 10 to 15 minutes, and a family therapist at St. Paul House, for about two hours. She testified that in February 2006, she also talked to a "nurse" at the "Family Medical Center," by which she apparently meant the Foster Care Clinic. She says she was told that the seizure medication could also be a mood stabilizer, and that there were no side effects. The latter point, about no [*5]side effects, unfortunately is not true.[FN6]

The respondent mother still wanted to speak to the clinic physician, and attempted to ask her a question, but she says the doctor "kinda blew me off"—though she indicates no direct contact with the doctor. The doctor herself admitted she did not talk to the mom regarding the medication and testified she did not receive any message from the mother regarding questions. On February 23, 2006, Lyle's mom and the caseworker spoke. Respondent mother testified she told the caseworker she did not want her son on the medication, but she signed the consent on that date. She admitted having had the opportunity to read and sign it, and claims no problem in comprehending the consent.
Even after signing the consent, the respondent mother testified that she immediately asked that he not be put on medication until she got more information. She says she signed the consent form to avoid the foster care mom "kicking out" her son. A few days later, he was on the medication. Respondent mother testified that she called the doctor's office—leaving a message that she had heard the side effects included stroke. She claims to have called three to four times, but the doctor did not answer or respond. She said she was told the doctor was on vacation. She also testified she asked the caseworker to take him off the medication, and was told she could not stop the medication as it had already been started. The boy was still on the medication at the time the hearing began, June 26, 2006.

Process Legally Insufficient

Although the Department obtained the respondent mother's consent, the process by which it did so did not protect the child's rights, or the parent's rights. The Department's apparent practice of having a caseworker, not the prescribing doctor, speak to the parent when seeking parental consent for the administration of the psychotropic drug, is insufficient. In this case, the prescribing doctor testified that instead of speaking to the mother directly about her Depakote Sprinkles recommendation, she wrote a note on the permission to administer medication form, which she signed as "Physician Recommending Treatment." Her notes on the form state that the medication name was "Valproate sprinkles (seizure medicine in this case used for mood stabilization)" and that the starting dose was "125 mg twice a day." She gave no alternative medications in the part of the form which allowed her to identify alternative medications which could be prescribed if the first drug fails. She wrote the cryptic annotation "because of shaking in sleep, may need EEG to R/O seizure disorder[.] [W]ill need liver and bone marrow blood tests in 2 wks along with valproate level[.]" The form itself indicates "Please see attached information," but no such sheet was introduced into evidence or given to the mother. Clearly, the doctor's notes indicate the medication being prescribed is not to be taken lightly. Relevant, detailed knowledge about Depakote Sprinkles/valproate sprinkles would not be something the average layperson parent would have. A knowledgeable physician's advice would be important to a parent behaving responsibly. Many parents might even demand a second opinion, and even the opinion of a child psychiatrist.
Despite the obvious shortcomings of this practice, the Department and the clinic physician who prescribed the psychotropic drug relied on the respondent mother's caseworker to [*6]communicate with her about the medication, give her a fact sheet about the drug, and seek her written consent. The plan to put Lyle on medication for his mental health/behavioral issues was first noted in the progress notes of the Department's records on February 15, 2006. The relevant note, written by caseworker Lockhart two months after the event, summarizes the consent practice of the clinic and Department, saying: "VMF Pam Burns in FC Pediatrics re: they would like to place Lyle on a medication, but Linda [the mother] needs to give consent. Requested that I pick-up the form and ask Linda to sign it. She can speak to the clinic if she has questions." The plan as stated was quite simply to get the mother's consent before she spoke to anyone at the clinic, or any doctor, if possible. The caseworker's first contact with the boy's mother about the medication was on February 16, 2006 at a visitation. Caseworker Lockhart testified that the first conversation lasted 5 to 10 minutes. The caseworker testified she did not give the mother a fact sheet, though she let her read the form signed by the doctor. She showed the consent to the respondent mother and explained that the little boy's behavior had been very worrisome, more so during the past several months, and that the doctor had recommended trying a medication. It is undisputed that the respondent mother wanted time to get advice and talk to another doctor, and so went away with a copy of the form. The caseworker's progress note for this discussion, entered two months after the event, is consistent with her testimony. Another worker at the visitation entered a progress note indicating the mother wanted rules, not medication, for her son. On February 23, 2006, at the foster care clinic itself, the Department's caseworker—again not the prescribing physician or any other medical professional—once more presented the boy's mother with the consent form while Lyle was acting wildly. The foster care mother was present and encouraged the mother to sign the form, explaining that she and the day care are just barely able to handle the boy at that point. The caseworker's progress note states in its relevant part,
"Linda was unsure what to do, and attempted to threaten Lyle that if he didn't act right, she was going to sign the form. I tried to explain to Linda that she should not threaten Lyle like that, that medication is not being prescribed as a punishment. Linda signed the form and handed it to me, talking about it no more. I gave the signed form to the nurse later in the visit."
The caseworker, who of course admitted that she was not a doctor or nurse or a person authorized to administer any kind of medication, let alone psychotropic medication, also testified as follows:
"Q. Did you have any discussion with her on that date in terms of what you thought the effect of medication would be on Lyle?
"A. Yes.
"Q. What did you say?
"A. We talked about what was written on the form[,] that the hope—the effect is that it would hopefully create mood stabilization, that it would decrease all of those peaks and valleys."
Thus, the mother signed the consent form without having a conversation with the prescribing physician which would normally serve as the basis for "informed consent." Public Health Law § 2805-d (1) states that
"[l]ack of informed consent means the failure of the person providing the professional treatment or [*7]diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical, dental or podiatric practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation."
One or more conversations with a caseworker, having no medical training, is no substitute for speaking directly with a prescribing physician. Nor did the boy's mother even see the alleged form which presumably would have provided some medical information about Depakote Sprinkles. The medication itself was apparently first administered on February 28, 2006, the day before the mother gave birth to her fourth child.

Discussion

A parent whose child is in foster care has the right to make the decision regarding whether or not his or her child will be given psychotropic drugs (Matter of Martin F., 13 Misc 3d 659 [Fam Ct, Monroe County 2006], supra). This is implicit in the Department's routine medical authorization form, which the mother did sign on behalf of her son. Obtaining consent for administration of Depakote Sprinkles in the manner done was improper due to the fact that the doctor did not speak to the child's mother personally. Informed consent requires speaking with an appropriate medical expert—not a Department caseworker—as indicated in the Public Health Law (§ 2805-d). Of course, a 4½-year-old child is not a competent patient, and the Department recognizes this by requiring a parent's signature on behalf of a child. It is common knowledge that physicians also routinely recognize a parent as the proxy or surrogate for the child and thus an extension of the child patient. Thus, a child's parent is entitled to the same respect as a competent patient. If a physician believes that a parent's decision is not what a child/patient, if competent, would have decided, and could not reasonably be judged to be within the child's/patient's best interests, then a court order to administer medication should be requested. (See AMA Code of Medical Ethics, Ops on Prac Matters E-8.081 ["Surrogate Decision-Making"].) Indeed, it appears that the respondent mother here was given no information on possible side effects by the prescribing doctor or even anyone on her behalf before signing the consent form, and thus she could not have given legal "informed consent."
A physician also has an ethical obligation to help a patient—or a parent acting for a child—make choices from among the therapeutic alternatives consistent with good medical practice. This respondent mother was given no alternatives. Rational, informed patients or parents should not be expected to act uniformly, even under similar circumstances, in agreeing to or refusing treatment (see AMAA Code of Medical Ethics, Ops on Prac Matters E-8.08 ["Informed Consent"]). It should not be left to a parent to attempt to make a medically-informed decision solely by finding another doctor who did not prescribe the medicine, as happened here. The fact that a caseworker managed to get the mother's consent on a form without her having a proper consultation with the prescribing doctor is not legally adequate consent. (Weathers v Millbrook Cent. School Dist., 428 F Supp 2d 180, 187 [SD NY [*8]2006].)[FN7]

Besides the opportunity to discuss the proposed medication with the prescribing physician, an objecting parent must be able to discuss the issues, including any consent form, with an attorney just as an adult mentally ill patient held in a mental health facility but not necessarily unable to comprehend a decision to refuse treatment by drugs has a right to counsel (Rivers v Katz, 67 NY2d 485 [1986]; cf. Mental Hygiene Law § 81.10 [providing statutory right to attorney if patient objects to major medical or dental treatment sought by petition]). This opportunity was never made available to Lyle's mother.

The Department's Procedure for Handling a Withdrawal of Consent
is Insufficient as Practiced

The Department failed to have a reasonable procedure to respond substantively and meaningfully to the mother's efforts to withdraw her consent. (Cf. Jurasek v Utah State Hosp., 158 F3d 506, 513 [10th Cir 1998] [holding that once a patient objects to the forcible administration of antipsychotic medicine, the state bears the burden of establishing continued need and medical appropriateness of the treatment], citing Riggins v Nevada, 504 US 127, 135 [1992].) In the case at bar, the mother tried unsuccessfully to withdraw her consent and stop the administration of the Depakote Sprinkles after learning about a side effect of the prescribed drug. Her phone calls to the clinic were not even relayed to the prescribing doctor according to the doctor herself, who testified she had no knowledge that the boy's mother had called to try to withdraw her consent. There is no evidence to the contrary.
The Federal Constitution recognizes a liberty interest in avoiding the unwanted administration of antipsychotic drugs (Mills v Rogers, 457 US 291 [1982]). Still, no effective effort appears to have been made to allay the mother's concerns or to honor them, and the medication was not stopped. The Department's progress notes of March 6, 2006 (entered April 18, 2006) indicate that the caseworker received a voice mail from Pam Burns at the clinic stating that the mother had called and stated she did not want her son "on meds." The voice mail indicated that Ms. Burns said the mother "can schedule an appointment to speak with [the clinic doctor] regarding questions. I should accompany her, and the kids should not come to the appointment." Another note on March 10, 2006 (entered April 18, 2006) says that the caseworker left a message with Burns in the clinic regarding setting up a meeting between the mother and the doctor. The notes for March 23, 2006 state that the foster care mother reported that the mother is considering having the medication stopped and claims the caseworker forced her to sign the consent. That [*9]same date another note says that the medication was explained to the mother at the clinic—but not by whom. The issue is not mentioned again in the progress notes. A patient—or a patient's surrogate—also has the right to courtesy, respect, responsiveness and timely attention to his or her needs. (See AMA Code of Medical Ethics, Ops on Patient-Physician Relationship E-10.01 ["Fundamental Elements of the Patient-Physician Relationship"].) Once having undertaken a case, the physician should not neglect the patient. (AMA Code of Medical Ethics, Ops on Prac Matters E-8.11 ["Neglect of Patient"].) "Neglect" would surely include refusing to deal substantively with a patient—or child's parent—regarding a request for a change in course of treatment.
It is the Department's responsibility to make certain procedures are in place to properly handle parental requests for changes in treatment regarding children in its care. (Cf. Mental Hygiene Law § 33.01; 14 NYCRR 27.8 [providing mentally ill patients may object to any form of care and treatment and may appeal decisions with which they disagree]; Savastano v Saribeyoglu, 126 Misc 2d 52, 54 [1984] [holding that, "[i]n furtherance of his 'liberty interest', a patient at a mental health facility may refuse administration of drugs . . . . Under law of this State, he may question the treatment and appeal any determination through successive agency hearings"].) It is significant that the mother herself testified she was told—by a caseworker, not a doctor or other medical professional—that the medication had already been started and could not be stopped. Whether or not a medication could be stopped, or how it best could be stopped, is of course a determination to be made first by a doctor, not a caseworker. This court holds that if a parent wants his or her child, in foster care, to be taken off a medication and the Department believes that would not be in the child's best interests, its recourse is to come to court to obtain an order that continues the medication. The court would have a hearing and make a decision about the contested prescription based on expert medical evidence and applicable legal principles.
Certainly neither a parent, judge, nor any other medical layperson would be likely to know more than a physician about an area of medicine within the doctor's field of expertise and training. However, who knows the most is not the issue here. A competent adult who wanted to stop taking a medication he or she was taking pursuant to a prescription could do so, even against a doctor's advice. Similarly a parent with custody of a child who wanted to stop any medication prescribed for that child certainly could do so. The issue here, however, is whether a biological parent, whose child is in foster care due to that very parent's neglect, has the authority to require a medication to be stopped by withdrawing consent. The related issue is what should happen if the custodial party—in this case the Department—believes that stopping the medication would be harmful. It is the position of the court that when a parent in such a situation changes his or her mind about continuing the administration of a medication requiring parental consent, the Department promptly should determine its position anew and either honor the withdrawal of consent by the parent or seek a court order. In the future, when the abrupt withdrawal would not be medically advisable the Department of Human Services will be required to seek a court order as soon as practicable[FN8]

to continue the medication pending a final determination. (Cf. Matter of Storar, 52 NY2d 363 [1981] [where incompetent patients' guardians [*10]objected to continued use of medical measures to prolong lives of the patients, who were diagnosed as fatally ill].)
In the event of a parent/Department dispute, the court must decide if the medication is to be stopped and how to do so safely. If stopping is not warranted or not within the reasonable choices for the child's care, the court can and should override the parent's objection and order the medication continued.
The Department failed to exercise its obligations with respect to Lyle, a child in its custody, because there was no formalized procedure for stopping a medication when his only involved parent withdrew consent, and no court decision about whether the medication should be continued or halted. The due process rights and liberty interests of the children guaranteed by the New York State Constitution were not followed. (See T.D. v New York State Off. of Mental Health, 228 AD2d 95, 115 [1st Dept 1996].) The fundamental point is that a parent maintains a right to make medication determinations even when the child is in foster care. (Matter of Martin F., 13 Misc 3d 659 [2006], supra; cf. Matter of Guardianship of Roe, 383 Mass 415, 421 NE2d 40 [1981].)[FN9]

This right, however, is not absolute, and hopefully with proper care and medical consultation, resort to the court to pick between medical options based on expert medical testimony will rarely be required. When parents oppose the administration of psychotropic drugs for their children in foster care the Department shall be required to go to court for an order before it can medically treat a child in a way not approved by a parent.[FN10]

Psychotropic drugs may be given to children in foster care when the Department of Human Services has fully informed the parent of the available information about the drug, provided an opportunity to discuss the medication with the prescribing physician and notified the parent of her right to discuss the written consent with her attorney and if she does not have one, advise her that an attorney will be appointed. All the requirements of an informed consent must be complied with. A consent signed by a parent must be obtained with knowledge, freely and voluntarily.
If the parent refuses to sign or after signing changes her mind, the Department of Human Services must not begin or continue medication until it has medical information that such [*11]medication is necessary and/or its abrupt discontinuance would be detrimental to the child. It must apply to the court for legal permission to continue or begin medication over a parent's objection. The burden is on the Department of Human Services to show that the parent was provided with necessary information, an appointment and opportunity to meet with the prescribing physician and an attorney to review the consent form. Sufficient time must be allowed for this process to unfold in each case.
Now, therefore, for the reasons set forth above, it is ordered that the Department shall immediately provide the respondent mother with an opportunity to consult with the physician who prescribed Depakote Sprinkles for her son, and with her lawyer and, unless the mother signs a new consent, the Department of Human Services must seek a court order to continue the medication; and it is further ordered that the permanency hearing report is otherwise approved, the goal of return to parent is approved all as in the best interests of the child; and it is found that reasonable efforts are being made to accomplish the goal.

Footnotes

Footnote 1: The respondent mother was pregnant with her fourth child at the age of 19 while these neglect cases against her were pending. In or about 2005, respondent was found to have neglected her first three children. A fourth child, born to respondent mother in 2006, is also in foster care. 

Footnote 2: The court does not know of any legal proceedings brought by the persons responsible for Lyle's foster care.

Footnote 3: The Department ultimately put in a foster home replacement request dated December 2005, stating, among other things regarding the foster home, "this continues to be a poor match for these children." Sex abuse in that home or involving these children or others was not mentioned in the request form.

Footnote 4: There was no testimony as to the cause of his PTSD. 

Footnote 5: Under the Department's current practice, administrative consent is virtually automatic in practice if a parent refuses to consent (see Matter of Martin F., 13 Misc 3d 659 [Fam Ct, Monroe County 2006]). For an interesting legal analysis of a patient's rights to refuse psychotropic drugs, with a useful discussion of the medical/legal debate, see The Right to "Just Say No": A History and Analysis of the Right to Refuse Antipsychotic Drugs (Dennis E. Cichon, 53 La L Rev 283 [1992]).

Footnote 6: For a detailed discussion of adverse side effects of antipsychotic medication, see Mills v Rogers (457 US 291, 294 n 1 [1982]) and Davis v Hubbard (506 F Supp 915, 928-929 [1980]).

Footnote 7: Weathers held that,
"[t]o establish a cause of action for malpractice based on lack of informed consent, plaintiff must prove (1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury." 

Footnote 8: The court is aware of several side effects from abrupt termination of medications and anticipates the Department of Human Services would take any necessary action to protect a child in its care and to act in his or her best interests.

Footnote 9: Roe involved the right of a noninstitutionalized but mentally incompetent person to refuse treatment with antipsychotic drugs. Expressly resting its decision on the common law of Massachusetts as well as on the Federal Constitution, Massachusetts' highest court held, inter alia, that a person does not forfeit his protected liberty interest by virtue of becoming incompetent, but rather remains entitled to have his "substituted judgment" exercised on his behalf, defined this "substituted judgment" as one for which "[no] medical expertise is required," and required a judicial determination of substituted judgment before drugs could be administered in a particular instance, except possibly in cases of medical emergency. (Matter of Guardianship of Roe, 383 Mass at 434-435, 421 NE2d at 51-52.)

Footnote 10: It will not be an acceptable procedure to require the parent to sign a blanket permission form for anything the Department wants to do—or to put such an ordering provision in an order of disposition. Parental permissions for a foster child's medical treatment, when needed, must be given separately, via informed consent, when parents are available to make such a decision because they are the parents and their rights are not terminated.